H. Harlan STONE, M.D.,
Plaintiff–Appellant,

Frederick K. Toy, M.D.; Walter Pegoli,
M.D., Intervenors,

v.

UNIVERSITY OF MARYLAND MEDI-
CAL SYSTEM CORPORATION; Mary
Humphries; John Dennis; Edward
Brandt, Jr.; Susan Gillette; Morton I.
Rapoport, Defendants–Appellees,

The Baltimore Sun Company,
Intervenor.

No. 87–3651.

United States Court of Appeals,
Fourth Circuit.

Argued April 4, 1988.
Decided Aug. 19, 1988.

Norman Roy Grutman (Jewel H. Bjork, Grutman, Miller, Greenspoon & Hendler, Henry P. Monaghan, New York City, John Philip Miller, Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., Baltimore, Md., on brief), for plaintiff-appellant.

Diana G. Motz (Shale D. Stiller, Frank, Bernstein, Conaway & Goldman, on brief), Ralph S. Tyler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Michael A. Anselmi, William F. Howard, Lawrence White, Asst. Attys. Gen., Baltimore, Md., on brief), for defendants-appellees.

Mary R. Craig (Doyle & Langhoff, Baltimore, Md., on brief), for intervenor.

M. King Hill, Jr. (John R. Penhallegon, Connie E. Williams, Smith, Somerville & Case, Baltimore, Md., on brief), for intervenors.

Before PHILLIPS, ERVIN, and WILKINSON, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

This is a 42 U.S.C. § 1983 action brought by Dr. H. Harlan Stone against his former employers, the University of Maryland School of Medicine and the University of Maryland Medical System Corporation, a private corporation which operates the University of Maryland Hospital, as well as various officials of both entities. Stone alleged that the defendants violated his due process rights by forcing him to resign from his employment without a hearing "under duress, threats, intimidation and coercion." The district court granted summary judgment for the defendants, and Stone appeals. Because we conclude that as a matter of law on the summary judgment record, Stone's resignation was voluntary, we affirm on the ground that the state did not "deprive" him of any protected interests in his employment within the meaning of the due process clause.

I

Stone was hired by the University of Maryland School of Medicine (the Medical School) in January 1983 as a tenured full professor of surgery.[1] In May 1984 he accepted an additional appointment as Chief of the Division of General Surgery and member of the medical staff at the University of Maryland Hospital (the Hospital); in that capacity, he was responsible for the supervision of a number of surgery residents. Under the terms of his employment contract with the Medical School, Stone could be discharged only for cause, after written notice of the charges against him and an opportunity for a hearing before the University's Board of Regents, but the President of the University could order a temporary suspension pending action by the Board of Regents. Under the Hospital's Bylaws, the Medical Executive Com-

mittee[2] was authorized to suspend Stone's clinical privileges whenever it determined that such action was "in the best interest of patient care in the Hospital." He could be permanently dismissed from the medical staff, however, only after written notice of the charges against him and an opportunity for a hearing before the Medical Executive Committee, with a right of appeal to higher authorities within the Hospital.

The events leading up to Stone's resignation began in April 1986, when the families of four patients who had died under Stone's care filed medical malpractice actions against him and several surgery residents working under his supervision. The malpractice actions contained allegations of gross recklessness and incompetence in surgical care; in addition, they accused Stone of failing to exercise adequate supervision over surgical residents and of encouraging them to falsify medical records in order to cover up errors in patient care. The malpractice actions received considerable publicity in the local media.

The Hospital referred the malpractice cases, together with several other incidents involving patients under Stone's care, to its in-house Peer Review Committee (PRC). The PRC spent approximately one month reviewing the medical charts and records of the specific patients concerned. It concluded that while there was no evidence of actual incompetence or deliberate falsification of patient records in the cases investigated, there were "significant deficiencies" in Stone's supervision of residents and his maintenance of patient records. JA 122–23; 130.

Alarmed by these findings, Hospital officials decided to appoint a committee of outside medical experts to investigate the situation in the Department of Surgery. The three-member External Review Com-

---

1. Reviewing the propriety of summary judgment, we draw our recitation of the facts from the summary judgment record, reflecting, except where dispute is indicated, facts either not in genuine dispute or in the form of those inferences from disputed facts most favorable to Stone as non-movant.

2. The Medical Executive Committee is the medical staff's governing council. Its voting membership is composed of the Chiefs of each clinical service in the Hospital, and the officers of the Medical Staff Organization, plus additional members elected at large from the medical staff. The Dean of the Medical School and the Chief Executive Officer of the Hospital are non-voting ex-officio members.

mittee (ERC) was made up of respected physicians from the medical schools at Harvard, the University of Chicago, and the University of Texas. It was instructed not to focus on the individual malpractice cases, but instead to conduct a broad review of the quality of clinical care throughout the Department of Surgery.

On June 10, 1986, the ERC delivered an oral report to the Chancellor of the University, the Dean of the Medical School, the President of the Hospital, and several other officials of the medical staff. According to the uncontradicted testimony of those who were present at the meeting, the ERC was quite critical of Stone's supervision of surgery residents, noting that he sometimes left them "virtually unsupervised," that he did not permit them to question his orders, and that he followed a practice of "two-tiered" medical care in which patients who could afford to pay for medical care received higher quality treatment than those who could not. The experts emphasized that this two-tiered system was indefensible both legally and morally. Finally, and perhaps most importantly, the ERC concluded that Stone had made a series of "self-serving misrepresentations" to the ERC and to his superiors at the Hospital in order to cover up irregularities in the treatment of Theodore Kozowyj, one of the patients who had died under his care.[3] J.A. 29; 33; 39–41.

Stone's superiors were stunned by the revelation that a professor of surgery and Chief of the Division of General Surgery had misled both the ERC and the Hospital's own Medical Review Committee about the circumstances leading up to the death of a patient under his care. They determined that they could not, under the circumstances, allow Stone to remain on the Hospital's medical staff. Accordingly, on the morning of June 13, 1986, the Dean of the Medical School summoned Stone to his office, advised him of the nature of the ERC's allegations, and suggested that it would be best for both Stone and the University if he resigned immediately. Stone refused to do so, saying he needed time to think and to consult his attorney.

Several hours later, the Dean called Stone to ask if he had reached a decision. When Stone said he had not, the Dean ordered him to report to the Chancellor's office, where he was confronted by the Dean, the Chancellor, and the President of the Hospital, together with counsel for both the University and the Hospital. Stone did not bring an attorney with him; he claims he had tried to locate one since speaking to the Dean that morning, but had been unable to do so because of a lawyer's convention. What happened at this meeting is subject to some dispute. Stone's superiors have asserted that they told Stone that the ERC's charges against him were so serious that unless he resigned from the Hospital's medical staff immediately, they would have to ask the Medical Executive Committee, which was scheduled to meet later that afternoon, to institute proceedings for his dismissal from the staff and to suspend his clinical privileges pend-

---

**3.** Kozowyj died when surgery residents under Stone's supervision sewed the wrong end of his colon to a colostomy bag, causing him to be poisoned slowly by his own waste. Stone told the ERC that the mistake occurred because Kozowyj's physical condition forced the surgeons to make an unusually small incision, which prevented them from discovering that his colon was twisted in an abnormal fashion. Stone also said that Kozowyj had no post-operative swelling that could have alerted the doctors of the mishap in time to save his life.

The ERC found Stone's account of Kozowyj's care to be directly contradicted by the patient's medical records, which revealed that the twisted colon was obvious from x-rays taken prior to the operation, that the incision had been larger than normal, and that the Hospital staff had noticed a significant amount of post-operative swelling in his abdomen. See J.A. 354–57.

Stone admits that the account of the Kozowyj case he gave the ERC contained several misstatements, but he characterizes them as "innocent mistakes" made because he was not given enough time to review his medical records before responding to the ERC's inquiries. But Stone had previously given precisely the same erroneous information about Kozowyj's treatment to the Chairman of the Department of Surgery for use in the Medical Executive Committee's investigation of Kozowyj's death. J.A. 33; 40; 43; 109. For this reason, Stone's superiors concluded that his misstatements represented "a deliberate attempt to not give correct information." J.A. 357.

ing the outcome of those proceedings. J.A. 29; 398–99. Stone has characterized the choice put to him a bit differently: he has asserted that he was told that if he did not resign immediately from the medical staff, the Medical Executive Committee would permanently "expel" him from it at its meeting that afternoon. In any event, it is clear that Stone's choice was not a pleasant one; revocation of clinical privileges, even temporarily, can have a devastating effect on a physician's professional reputation, make it difficult to obtain malpractice insurance, and severely jeopardize his prospects for future employment.

Stone asked for time to call his attorney and was permitted to leave the room to do so. He was gone approximately one half hour, during which his superiors assumed he was consulting his attorney. According to Stone, he spoke not with an attorney but with a long-time friend and fellow surgeon, who advised him to resign rather than face the possibility of expulsion from the medical staff, which he characterized as "professional suicide." Stone says the friend advised him to try to obtain assurances that his resignation would go on record as having been completely voluntary and that he would continue to receive his salary until he obtained other employment.

Stone returned to the Chancellor's office and told his superiors that he would resign immediately from his positions at both the Hospital and the Medical School on the following conditions: (1) that his resignations from both institutions would be "without prejudice"—that is, that they would not constitute an admission of any wrongdoing; (2) that his resignation from the Medical School would be delayed until July 1, 1987, unless he found other employment before that date; and (3) that he would continue to receive his Medical School salary until the effective date of his resignation from that institution. He did not ask for a hearing on the charges against him. Stone's superiors agreed to his terms and directed their attorneys to draw up appropriate letters of resignation. Stone read the letters carefully, demanded several changes, and then signed the revised versions. The President of the Hos-

pital and the Dean of the Medical School promptly executed letters accepting Stone's resignations on behalf of their respective institutions. Each letter acknowledged that Stone's resignation was not an admission of the validity of any of the accusations against him or of any other wrongdoing which might be cause for his termination. J.A. 106; 108.

Stone's resignation from the Hospital was effective immediately. As contemplated by the June 13 agreement, however, he was permitted to remain on the Medical School faculty—and to draw his Medical School salary—while he searched for other employment. In June 1987, nearly one year after he agreed to resign, Stone finally notified the Dean by letter that he had obtained employment elsewhere; at that point, his resignation from the Medical School finally became effective. During the eleven-month interval between his decision to resign and his actual departure from the Medical School, Stone did not once request a hearing on the charges against him, nor did he make any effort to withdraw his resignations. He did, however, accept nearly $65,000 in salary payments from the Medical School.

In November 1986, five months after he agreed to resign but before he obtained employment elsewhere, Stone filed this § 1983 action against the Dean of the Medical School, the Chancellor of the University, and counsel for the Chancellor, all of whom were employees of the State of Maryland. Also joined as defendants were three nominally private parties—the Hospital, its President, and its counsel—who Stone alleged had acted in concert with the state employees. Stone alleged that the defendants had violated his due process rights by forcing him to resign from his positions at the Hospital and the Medical School without a hearing. For this alleged wrong, he sought $6 million in compensatory and $20 million in punitive damages.

Upon completion of discovery, the defendants moved for summary judgment on four alternative grounds: (1) that Stone had resigned from his positions at both institutions voluntarily; (2) that even if the

resignations had been obtained involuntarily, Stone could not challenge them because he had "ratified" them by his subsequent acts; (3) that the post-deprivation remedies available to Stone under state law provided all the process that was constitutionally due him and prevented him from making out a due process claim under the doctrine of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); and (4) that even if Stone had a viable due process claim, the defendants were immune from damages liability because they had acted in the good faith belief that their conduct did not violate any clearly established law. The district court granted the motion on all four grounds, and this appeal followed.

## II

As indicated, the district court based its grant of summary judgment alternatively upon all four of the grounds advanced by defendants.

On appeal, the parties have, with varying degrees of emphasis, joined issue on all four grounds. Because it is the core issue and in our view is dispositive of Stone's action, we discuss only the first: Whether Stone was deprived of a constitutionally protected property interest by the defendants' conduct leading to his resignation. If he was not so deprived, that ends the matter; the other issues become irrelevant, without regard to their merits, as to which we therefore need express no view.[4]

Stone's basic § 1983 claim of course is that he was deprived of his property inter-

est in continued employment by defendants acting under color of state law, hence by state action, without due process of law, in violation of rights secured by the fourteenth amendment. On this appeal he claims the protections of both the substantive and procedural components of the due process clause, and the defendants have argued the issue in those terms.

The critical point, however, is that in order to claim entitlement to the protections of the due process clause—either substantive or procedural—a plaintiff must first show that he has a constitutionally protected "liberty" or "property" interest, *see Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and that he has been "deprived" of that protected interest by some form of "state action," *see Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Unless there has been a "deprivation" by "state action," the question of what process is required and whether any provided could be adequate in the particular factual context is irrelevant, for the constitutional right to "due process" is simply not implicated.

In this case, there is no question that Stone had a constitutionally protected "property" interest in his continued employment with both the Hospital and the Medical School, as he could be discharged from each position only for cause. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985).[5] But that leaves the

---

4. Other than to note, lest there be any misapprehension from our silence, that the *Parratt v. Taylor* argument was completely inapposite in this situation where pre-deprivation process was easily possible, hence was that due if any was due.

5. Stone's complaint also alleged that the defendants "failed to accord [him] due process in regard to his right to be free from taint in his reputation, good name, honor and integrity." J.A. 7. This suggests that Stone means to claim that the defendants' conduct deprived him of a "liberty" as well as "property" interest. In order to state such a claim, Stone would have to allege facts tending to show that his superiors made charges against him that "might seriously damage his standing and associations in his community" or otherwise "imposed on him a stigma or

other disability that foreclosed his freedom to take advantage of other employment opportunities," *Board of Regents v. Roth,* 408 U.S. 564, 573–75, 92 S.Ct. 2701, 2707–08, 33 L.Ed.2d 548 (1972); that those charges were made "public" by his employer, *Bishop v. Wood,* 426 U.S. 341, 348–49, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976); and that the charges were false, *see Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977). Whether the allegations of this complaint are legally sufficient to satisfy these requirements is a difficult question, for it is unclear whether the charges against Stone were made public by his employers or by third parties within the Hospital. We need not decide this question, however, because the clear implication from *Paul v. Davis,* 424 U.S. 693, 710–11, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405

more difficult question whether he was "deprived" of that interest by some form of state action.[6] Had he been officially discharged from his public employment, the answer would be evident. But Stone's superiors never officially "fired" him—he resigned. If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state "deprived" him of it within the meaning of the due process clause. *Cf. Martinez v. California*, 444 U.S. 277, 281, 100 S.Ct. 553, 557, 62 L.Ed.2d 481 (1980) (the mere fact that state action sets in motion a chain of events that ultimately leads to loss of a plaintiff's protected interest does not of itself establish that there has been a "deprivation by state action" in the constitutional sense). If, on the other hand, Stone's "resignation" was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by state action triggering the protections of the due process clause. A public employer obviously cannot avoid its constitutional obligation to provide due process by the simple expedient of forcing involuntary "resignations." The proper focus of the constitutional inquiry here is therefore on the voluntariness of Stone's resignation. The answer to that factual inquiry is dispositive of the constitutional "deprivation" issue, and potentially of the constitutional claim.

Only a handful of courts in addition to the district court here have addressed the question of when a "resignation" from public employment that has been requested by the employer is sufficiently involuntary to trigger the protections of the due process clause. *See, e.g., Dusanek v. Hannon*, 677 F.2d 538, 542–43 (7th Cir.1982); *Morrell v. Stone*, 638 F.Supp. 163, 166–68 (W.D.Va.1986); *Illinois ex rel. Schoepf v. Board of Educ.*, 606 F.Supp. 385, 390 (N.D. Ill.1985). In conducting the dispositive factual inquiry into voluntariness, these courts have looked for guidance to a line of cases dealing with the closely analogous question of when a federal employee's "resignation" is actually a constructive discharge entitling him to certain procedural rights under the civil service acts. *See, e.g., Christie v. United States*, 518 F.2d 584, 207 Ct.Cl. 303 (1975). Those latter cases are of course concerned with a resigning employee's right to procedural protections guaranteed by federal statute, whereas this case involves the right to protections guaranteed by the Constitution itself. The cases are perfectly apposite analytical sources, however, for the dispositive factual inquiry—whether the apparent "resignation" was in fact involuntary—is essentially the same in both situations. We therefore join those courts which have looked to the civil service cases for guidance in conducting the voluntariness inquiry.[7]

(1976), is that a public employer's stigmatizing remarks do not deprive an employee of a liberty interest unless they are made in the course of a discharge or significant demotion. *See Lawson v. Sheriff of Tippecanoe Co.*, 725 F.2d 1136, 1139 (7th Cir.1984); *Mosrie v. Barry*, 718 F.2d 1151, 1160–62 (D.C.Cir.1983); *Moore v. Otero*, 557 F.2d 435, 438 (5th Cir.1977). Our finding that Stone was not discharged from his public employment but resigned voluntarily thus effectively disposes of any liberty interest claim he might assert.

6. The parties have stipulated, for the purposes of this summary judgment motion only, that the conduct of which Stone complains is "state action" under the fourteenth amendment and thus action "under color of law" under § 1983. Accordingly, we need not decide whether the conduct of the three defendants who are not state employees can properly be called "state action" within the meaning of the fourteenth amendment.

7. These courts, as did the district court here, have referred to a voluntary resignation as a "waiver" of procedural rights to which the employee would otherwise be entitled under the due process clause. *See Morrell*, 638 F.Supp. at 168 ("[H]aving voluntarily resigned, plaintiff cannot now claim he was denied procedural protections that he waived."); *Schoepf*, 606 F.Supp. at 390 ("[P]laintiff's resignation was voluntary and, thus, any due process rights to which he otherwise would have been entitled are waived."); *see also Dusanek*, 677 F.2d at 543 ("[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the [employee] has simply refused to avail himself of them.").

While in the end here it is of no moment, we deem it prudent to say that in citing these cases *we do not accept the technical accuracy of their* treating the voluntary resignation of a public employee as a "waiver" of the procedural rights provided to protect an underlying property in-

■ The basic approach in those cases is the obvious one of looking to the circumstances of the resignation to determine whether the employee was denied the opportunity to make a free choice. *Scharf v. Department of the Air Force*, 710 F.2d 1572, 1574 (Fed.Cir.1983) (*citing Perlman v. United States*, 490 F.2d 928, 933, 203 Ct.Cl. 397 (1974)). Inevitably, particular resignations have been found involuntary, hence, per our analysis, "deprivations" of property, in two circumstances: (1) where obtained by the employer's misrepresentation or deception, *see, e.g., Scharf*, 710 F.2d at 1574–76; *Covington v. Department of Health & Human Serv.*, 750 F.2d 937, 942–44 (Fed.Cir.1984), and (2) where forced by the employer's duress or coercion, *see, e.g., Schultz v. United States Navy*, 810 F.2d 1133, 1135–37 (Fed.Cir.1987). Both obviously involve situations in which the employer's conduct has prevented the employee from making a free and informed choice, hence, in our terms, has effectively deprived the employee of his protected property interest.

■ Under the "misrepresentation" theory, a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. *See Scharf*, 710 F.2d at 1575. A misrepresentation is material if it concerns either the consequences of the resignation, *see id.* (effect on accumulated sick leave) or the alternative to resignation, *see Covington*, 750 F.2d at 942 (omission to explain right to be reassigned if resignation declined). The reliance must be reasonable under the circumstances. *Scharf*, 710 F.2d at 1575.

■ Under the "duress/coercion" theory, a resignation may be found involuntary if on the totality of circumstances it appears that the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter. Factors to be considered are (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation. *See Taylor v. United States*, 591 F.2d 688, 691, 219 Ct.Cl. 86 (1979) (using factors derived from Federal Personnel Manual). In applying this totality of circumstances test, the assessment whether real alternatives were offered must be gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation—for example, because of concerns about his reputation—is irrelevant. *See Christie*, 518 F.2d at 587–88. Similarly, the mere fact that the choice is between comparably unpleasant alternatives—e.g., resignation or facing disciplinary charges—does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary. *Id.* This is so even where the only alternative to resignation is facing possible termination for cause, unless the employer actually lacked good cause to believe that grounds for termination existed. *Id.* at 587–88 ("The fact remains, plaintiff *had a choice*. She could stand pat and fight") (emphasis in original); *see also Pitt v. United States*, 420 F.2d 1028, 190 Ct.Cl. 506 (1970) (resignation not involuntary where alternative was criminal charges); *Cosby v. United States*, 417 F.2d 1345, 189 Ct.Cl. 528 (1969) (same; charges of gross insubordination); *Autera v. United States*, 389 F.2d 815, 182 Ct.Cl. 495 (1968) (same; charges of incom-

terest. Under traditional due process analysis, procedural protections arise only in connection with a state's "deprivation" of a protected interest. A proper analysis would then recognize that the public employee who resigns voluntarily has no procedural rights to waive because he has suffered no deprivation at the hands of the state; procedural due process is not implicated. Rather than "waiving" procedural rights, he has voluntarily surrendered the property interest upon whose existence the procedural rights depend.

Of course in a case where there has been a "deprivation," whether by coercing a resignation or otherwise, there could then be an independent waiver of the procedural protections thereby triggered. *See, e.g., Fuller v. Laurens Co. School Dist. No. 56*, 563 F.2d 137, 140–41 (4th Cir.1977).

petence); *but see Schultz,* 810 F.2d at 1136–37 (resignation involuntary where induced by threat of termination where employer lacked good faith basis for believing that cause existed).

### III

In applying these general principles here, we must take into account that Stone invoked both misrepresentation and coercion theories in support of his critical factual claim that his resignation was involuntary, hence a deprivation by state action of his property interest. This means that we must assess the rejection of his claim in light of both theories, and further in light of the fact that the rejection was by summary judgment. This in turn means that we may affirm only if on the summary judgment record there was no genuine dispute as to any material fact, and if on the undisputed facts defendants were entitled to judgment as a matter of law under both theories. Fed.R.Civ.P. 56(c).

Analyzing the record on this basis we conclude, in agreement with the district court, that as a matter of law on the undisputed facts, Stone's resignation was neither induced by misrepresentation nor coerced by the defendants, hence that he was not deprived of a protected property interest by state action. We consider the misrepresentation and coercion theories in order.

■ Stone's misrepresentation theory is based upon his assertion that his superiors told him they would discharge him from the medical staff the very afternoon of the June 13, 1986 meeting if he did not resign immediately. This concededly would have been a misrepresentation of material fact, since the Hospital's Bylaws provided that such a termination could be accomplished only after several days' written notice of the charges against him and an opportunity for a full evidentiary hearing before the Medical Executive Committee. Stone's superiors denied this assertion. According to them, they told Stone that if he did not resign they would go before the Medical Executive Committee that afternoon with charges that would set in motion the lengthy process of dismissing him for cause, and that the Committee might suspend his clinical privileges immediately pending the outcome of those proceedings. If their version of the facts is true, there was no misrepresentation made, for the Medical Executive Committee unquestionably had authority to suspend Stone's clinical privileges summarily whenever it determined that such action was in the best interest of patient care at the Hospital. Stone claims the existence of this factual dispute precludes the entry of summary judgment against him.

On the record, it is arguable that any "dispute" as to what was said on this critical occasion was not a "genuine" one, for an apparent dispute is not "genuine" within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the fact in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). It is highly questionable whether on the evidence in this record, a jury reasonably could have found that Stone was actually told that his only alternative to resignation was expulsion without further ado.

The only evidence supporting Stone's version is that contained in his own statements in affidavit and deposition form. These do indeed contain carefully worded statements to the general effect now claimed: that defendants "demanded my immediate resignation and threatened that if I did not accede at once [they] would have me expelled at a meeting [they were] to attend later that afternoon," Stone Affidavit, J.A. 226; defendants "insisted upon my immediate resignation with the threat that otherwise I would be expelled later that afternoon," *id.* at 227; defendants "told me that if I did not submit my immediate resignation ... [they] would have me dismissed from the medical staff, expelled from the medical staff," Stone Deposition, J.A. 69.

While these conclusory assertions may seem to put the critical nature of the defendant's threatened alternative in real dis-

pute, closer analysis of the record draws this in serious question. In the first place, the statements they attribute to defendants, even if made in one of the several forms asserted, are actually susceptible to two diametrically opposite interpretations: that they threatened summary expulsion without further procedural ado, or only the swift bringing of charges that were believed to be sufficient to justify ultimate expulsion and, pending that determination, immediate suspension of clinical privileges. As indicated, the former would be a misrepresentation, while the latter would not.

That the latter is much more likely to have been the actual burden of defendants' statements to Stone is then strongly suggested by Stone's own position when pushed on deposition to clarify his recollection on the critical point. At that point he waffled, admitting that defendants had not specifically asserted that he would be expelled summarily that very afternoon, and now claiming only that "that was the connotation" of their statements. J.A. 69–71.

It is, as indicated, certainly arguable that these varying ascriptions of the language used and meaning intended by the defendants are insufficient to enable a jury reasonably to find, as Stone had the burden to prove, that defendants misrepresented to him their power to expel him summarily. See Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to survive a properly supported motion for summary judgment]."); see also Schoonfield v. Mayor of Baltimore, 399 F.Supp. 1068, 1078 (D.Md.1975) ("Neither plaintiff's rhetoric nor his imagination can make undisputed facts into disputed ones or raise a genuine issue with respect thereto."), aff'd, 544 F.2d 515 (4th Cir.1976).

But because to some extent the existence of a genuine dispute as to the exact nature of defendants' threats may involve Stone's credibility, we might be hesitant to affirm the grant of summary judgment on the basis alone that they did not involve material misrepresentations. In any event, we need not, because there exists another,

firmer basis for doing so. Another critical element of Stone's misrepresentation theory is that he reasonably relied to his detriment on the asserted misrepresentation. As to that we are satisfied that, on this record, he could not as a matter of law be found to have relied reasonably on any misrepresentation made by the defendants that they had the power to expel him summarily. Accordingly, even if there is a genuine dispute as to whether a misrepresentation on this point was made, it is rendered immaterial by the absence, as a matter of law, of sufficient evidence from which a jury reasonably could find that Stone reasonably could have relied to his detriment upon it.

Undisputed facts of record make it simply incredible that a person situated as was Stone could reasonably have accepted the asserted misrepresentation and resigned on that basis. At the time of his resignation, Stone was a sophisticated and well-educated physician with over thirty years of service—both as a surgeon and as an administrator—on the medical staff of a number of different teaching hospitals. He had served as the Chief of this particular Hospital's Division of General Surgery for two years, and in that capacity had supervised the work of numerous interns, residents, and other members of the medical staff. He has conceded that he was familiar with the Hospital's Bylaws, see J.A. 70, and he was certainly aware that members of the medical staff could be removed from their positions only in accordance with the procedures specified in those Bylaws. While he may not have known precisely what those procedures were, a person of his experience and sophistication in administrative matters was certainly not justified in resigning on the basis of his superiors' representations about the nature of those requirements without consulting the Bylaws themselves. For this reason, the alleged factual dispute about what Stone was told was the alternative to resignation, even if genuine, would not preclude the entry of summary judgment because in the absence of reasonable reliance it is simply not material—that is, it could not affect the outcome of the suit under the applicable substantive law.

*See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ Stone's more substantial argument is that his resignation was the result of "duress, threats, intimidation and coercion" on the part of his superiors. His argument is, in essence, that he was forced to make the personally and professionally difficult decision whether to resign or face termination proceedings on the spur of the moment, while he was upset and confused and without the advice of counsel or the opportunity to consult family and friends. *See* Appellant's Brief at 6–9. But the mere fact that Stone was forced to choose between the inherently unpleasant alternatives of resignation and possible termination for cause does not itself mean that his resignation was submitted under duress, absent evidence that his superiors lacked good cause for the threatened termination. That showing has simply not been made here. The allegations contained in the ERC's oral report—in particular, its finding that Stone had deliberately misled both the ERC and the Hospital's own Medical Executive Committee about the circumstances leading up to the death of a patient under his care—were manifestly good cause for his discharge. There is no evidence in the record to suggest that Stone's superiors knew or believed that the ERC's charges against him could not be substantiated.[8] In truth, the summary judgment record establishes beyond doubt that Stone's superiors had more than enough evidence to threaten him with termination for cause, and were in fact obligated to act on that information in order to protect the safety of patients under his care.

It is true that Stone was forced to make the decision whether to resign or face removal proceedings under some time pressure and that he did so without the advice of counsel. Under different circumstances, these facts might be sufficient to raise a genuine issue as to the voluntariness of his resignation. *See Paroczay v. Hodges,* 297 F.2d 439 (D.C.Cir.1961). In this case, however, those facts lose their significance when they are viewed against the background of the summary judgment record as a whole. Stone was not a naive intern in his first clinical assignment; he was a sophisticated and well-educated hospital administrator with over thirty years experience as a member of the medical staffs of some of the finest hospitals in the country. Despite his counsel's assertions to the contrary, the undisputed facts establish that he was fully informed of the nature of the charges against him. He knew what his rights were, and if he did not, he was given ample time to find out. He was given several hours to contact an attorney and failed to do so; his proffered excuse—that all the attorneys in the City of Baltimore were at an attorneys' convention—is patently incredible. He was permitted to seek the advice of anyone he wished and did in fact manage to contact an old friend and fellow surgeon. He dictated the terms of his resignation himself, and he drove a hard bargain, demanding that he be given a clean record, a delayed effective date, and a full year's salary. Under these circumstances, we have no difficulty in concluding

**8.** Though Stone has attempted to impugn his superiors' motivation for proceeding with the proposed termination—he says they wanted a "scapegoat" to blame for the deaths of the four patients, in order "to distance themselves from any alleged wrongdoing"—he does not deny that the incidents which formed the basis of the charges against him occurred. Instead, he claims that the defendants' account of the ERC's oral report is contradicted by a "formal written report" the panel submitted the following day. Like many of the claims made in Stone's brief, this allegation is directly refuted by a careful examination of the record itself. The document to which Stone refers is a June 11, 1986 letter from one of the committee members to the Chancellor of the University, suggesting that, in the author's view, Stone's supervision of residents was generally satisfactory. See J.A. 266 (letter from Dr. Scannell to Chancellor Brandt). But all three members of the ERC—none of whom are defendants in this case—have submitted affidavits indicating that the defendants' account of their oral report of Stone's misrepresentations is completely accurate, that the ERC never made any sort of written report, and that the Scannell letter represented the author's own views, rather than the ERC's official conclusion. J.A. 385, 387, 390. Indeed, Scannell himself says that while he found Stone's supervision of residents to be generally satisfactory, he was convinced that the errors Stone made in his account of the Kozowyj case were "neither minor nor ... 'innocent.'" J.A. 387.

.. 

that his resignation represented a carefully considered choice between two unpleasant alternatives, and was therefore, as a matter of law, not an involuntary one amounting to a deprivation of property.

Any lingering doubts we might have about the voluntariness of Stone's resignation are allayed by consideration of his conduct following it. In the five months between his decision to resign and the filing of this lawsuit, he did not make any effort to rescind his resignations or to request a hearing on the charges against him. Instead, he represented himself to third parties as having resigned from his positions at the University of Maryland voluntarily, occasionally even using official Medical School stationery. See J.A. 142, 148, 228. He continued to accept salary payments from the Medical School. Perhaps most critically, in June 1987, six months after filing this lawsuit, he specifically confirmed his resignation by sending the Dean of the Medical School official notice that his salary and benefits should be terminated because he had finally obtained employment elsewhere. See J.A. 137. At no point—not even after filing this lawsuit—has he ever requested that he be given a name-clearing hearing.[9] These actions simply cannot be reconciled with Stone's assertion that his resignation was in fact an involuntary discharge.

IV

In sum, we hold that the only reasonable conclusion from the summary judgment record is that Stone made a carefully considered and entirely voluntary decision to resign rather than submit to proceedings that might lead to compelled termination of his clinical privileges. Subsequent events—in particular, his difficulty in locating other employment—presumably led him later to second guess his decision. In this action he therefore has sought to recharacterize his voluntary resignation as a constructive discharge, entitling him to monetary relief for a resulting deprivation of his property interest by state action. But he

has failed, as was his burden, to come forward with evidence sufficient to create a genuine issue of material fact as to the involuntariness of that resignation. We therefore conclude, in agreement with the district court, that his resignation must be deemed voluntary as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Since this in turn means that Stone was not "deprived" of any protected interest in his employment by the state, it effectively disposes of his due process claim.

AFFIRMED.

---

9. Significantly, though Stone's lawsuit seeks damages for the alleged failure to provide him with a name-clearing hearing, he does not request the injunctive relief of a hearing itself.