45 F.3d 426
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Charles C. HOOPER, Jr., Plaintiff-Appellant,
v.
STATE of Maryland, Department of Human Resources; Carolyn
W. Colvin, Defendants-Appellees,
and Lois Whitaker; Henry Pringle, Defendants.
 No. 94-1067.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 31, 1994.
Decided Jan. 10, 1995.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. M. J. Garbis, District Judge. (CA-92-1731-MJG)
 ARGUED: Barry Charles Steel, Towson, MD, for Appellant. Sandra Irene Barnes, Assistant Attorney General, Baltimore, MD, for Appellees. ON BRIEF: C. William Michaels, Baltimore, MD, for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Carmen M. Shepard, Assistant Attorney General, Baltimore, MD, for Appellees.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Charles Hooper has appealed entry of summary judgment for the Maryland State Department of Human Resources ("DHR") and DHR's Secretary, Carolyn Colvin, on Hooper's claim of reverse race discrimination in employment. The district court granted summary judgment on the grounds that Hooper had not suffered any adverse employment action, but rather had volunteered for the employment action, a transfer. Finding no genuine issue of material fact, we affirm.
 
 
 2
 Hooper had been the Director of Personnel for DHR for nine years when Colvin was appointed Secretary of DHR. As Director of Personnel, Hooper had a Rank 19 salary and significant management responsibilities over a large staff. In the summer of 1991, Secretary Colvin learned that DHR's Department of Personnel had a rotational training program for personnel managers. She asked Hooper's supervisor, Mark Friedman, to make arrangements for Hooper to participate. Colvin has claimed that she was dissatisfied with Hooper's performance in several areas, and that her motive in ordering Hooper's participation in the rotational program was to improve Hooper as a manager. Colvin had, herself, previously participated in a rotation developed by the Governor in which state agency heads had temporarily exchanged positions.
 
 
 3
 Hooper has claimed that Colvin's motive was racially discriminatory. As evidence of such a motive on Colvin's part, Hooper has adduced testimony that Colvin stated at a September, 1991 staff meeting that the number of black males employed at DHR could be increased by "transfer[ing] people around ... to create vacancies." Yet even before that staff meeting Hooper feared that if he participated in the exchange program he would not be permitted to return to his position as Director of Personnel. However, Hooper has adduced no evidence that the exchange would be otherwise than temporary. The program itself specified that rotation durations should be between six and twelve months unless other arrangements were "mutually agreed upon with all the parties involved," and that during a rotation, participating employees would remain in their respective permanent positions for budget and salary purposes.
 
 
 4
 In August of 1991, when Friedman, Hooper's supervisor, told Hooper that Colvin wanted Hooper to participate in the rotation program, Hooper requested that, instead, he be transferred permanently to another position "functionally commensurate with [his] title in personnel." Hooper specifically asked Friedman if he could be transferred to the Baltimore County Department of Social Services ("DSS"), and asked that he be allowed to bring his secretary with him to his new position. Hooper preferred the Baltimore County DSS to other DHR offices for commuting convenience reasons, and was aware that DSS already had a Director of Personnel.
 
 
 5
 Friedman then talked with Camille Wheeler, Director of Baltimore County DSS. Although Wheeler did not have any specific openings, she told Friedman that she could always use a good manager. Wheeler then called Colvin to request a reference for Hooper. Wheeler told Colvin, as she had told Friedman, that her Department had no specific vacancies, but that she could find a way to use Hooper as a manager.
 
 
 6
 After her conversation with Wheeler, Colvin went to Friedman to ask why Hooper was transferring instead of rotating. Friedman explained to Colvin that "[Hooper] did not wish to participate in [an exchange] program and preferred to go to Baltimore County." Colvin told Friedman, as she had Wheeler, that she would allow Hooper to transfer, and that she would allow him to take his Rank 19 salary with him, but that she would not release him until a replacement Director of Personnel for DHR was identified. Further, Colvin told Friedman that she did not want Hooper to do make-work in his new position.
 
 
 7
 In December 1991, after a replacement for Hooper, a black male, was identified, Hooper was given a release date to go to Baltimore County.
 
 
 8
 Wheeler and Hooper then met to discuss what duties Hooper might assume. Colvin was not involved in those discussions, had no role in determining what duties Hooper would assume, and had no discussions with either Wheeler or Hooper about the matter.
 
 
 9
 After meeting with Hooper, Wheeler determined that her greatest need for someone with Hooper's skills was as the manager of the Income Maintenance Office in Catonsville, Maryland, where she had a vacancy. Although Hooper had no previous experience in income maintenance, Wheeler wanted to use Hooper's management abilities. The position was typically filled with a Rank 15 employee, but Hooper would remain a Rank 19 for salary computation purposes.
 
 
 10
 Accordingly, when Hooper reported to DSS for work, Wheeler requested that he go to the Catonsville operation. Hooper, however, after thirty minutes at the Catonsville office, decided that the position held no interest for him and departed, telling no one. His secretary, who had been transferred with him, was promoted to a higher position. Wheeler subsequently learned that Hooper had taken leave and was looking for employment elsewhere.
 
 
 11
 Hooper eventually returned to Baltimore County DSS, and demanded that he be given work involving personnel-related matters only. Wheeler then requested that Hooper administer the DSS staff development and training program in Towson. Hooper accepted the suggested position, again typically filled by a lower ranked employee. Hooper has claimed that the job has almost no responsibilities and that he does almost nothing all day. Wheeler has explained that Hooper has defined his position narrowly, declines all opportunities to participate in developing personnel policy, and refuses to interact with other staff. The only position which Hooper has stated he would find appropriate at Baltimore County DSS is the Personnel Director position, a position that he knew was not available when he first requested the transfer to Baltimore County.
 
 
 12
 Hooper filed suit in June of 1992, asserting that the actions of Colvin and the DHR amounted to racial discrimination in employment, in violation of Section 1981, Section 1983, and Title VII of the Civil Rights Acts of 1870, 1964, and 1991, 42 U.S.C. Secs. 1981, 1981A, 1983, and 2000e et seq.
 
 
 13
 Appellees Colvin and DHR moved for summary judgment after discovery. The district court granted the motion, finding that Hooper had not established that Colvin and DHR constructively transferred him from his position at DHR. Hooper filed a motion to alter or amend the court's order granting summary judgment, arguing that the theory of his case was not that he had been constructively transferred but that he had been involuntarily demoted. The court denied his motion, finding that the undisputed facts established that Hooper voluntarily transferred to Baltimore County DSS.
 
 
 14
 This court reviews a decision granting summary judgment de novo. E.g., Gray v. Farley, 13 F.3d 142, 145 (4th Cir.1993). In order to affirm a district court's grant of summary judgment, we must determine, viewing the disputed facts in the light most favorable to the nonmovant, that no reasonable jury could find for the nonmovant. E.g., Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir.), cert. denied, 113 S.Ct. 2999 (1993). As we explained in Ford Motor Co. v. McDavid,
 
 
 15
 [I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.
 
 
 16
 259 F.2d 261, 266 (4th Cir.), cert. denied, 358 U.S. 908 (1958). A nonmovant must produce more than a mere allegation of the existence of a material fact to survive summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
 
 
 17
 We have held that the factual elements necessary to establish a prima facie case of employment discrimination are the same for Title VII, Section 1981, and Section 1983 claims. Gairola v. Commonwealth of Virginia Dept. of General Services, 753 F.2d 1281, 1285 (4th Cir.1985). In a suit alleging disparate treatment, a plaintiff must ultimately show that he or she was subject to an adverse employment action (e.g., fired, demoted, passed up for promotion, or not hired), which action was, more likely than not, motivated by plaintiff's race. Gairola, 753 F.2d at 1286; see also, e.g., 42 U.S.C. Sec. 2000e-2(a)(1) (1981) ("It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin.") (emphasis added); International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977) (" 'Disparate treatment' is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.") (emphasis added). If the employment action was voluntarily taken by the employee, the action can not be said to have been motivated by racial discrimination on the part of the defendant employer, and no reasonable jury could find for plaintiff. Stone v. University of Maryland Medical System Corp., 855 F.2d 167, 173 (4th Cir.1988); Glymph v. Spartanburg General Hospital, 783 F.2d 476, 479 (4th Cir.1986).
 
 
 18
 Thus, for Hooper to prevail he must show that he was subjected to an adverse employment action, and that this action was motivated by discrimination against him on account of his race. If DHR and Colvin took no adverse employment action, no reasonable jury could find for Hooper, and summary judgment was properly entered against him. Cf. Page v. Bolger, 645 F.2d 227, 232-33 (4th Cir.) (en banc), cert. denied, 454 U.S. 892 (1981) (holding that complaint of racial imbalance in the composition of a hiring committee does not state a claim because committee composition is not an adverse employment action). If DHR or Colvin subjected Hooper to an adverse employment action, but the action was not motivated by racial animus, no reasonable jury could find for Hooper. See Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130, 1133 (4th Cir.1988) (plaintiff must show racial animus was a motivating factor in a disparate treatment case). If Hooper volunteered for the adverse action, the action was not motivated by racial animus on the part of DHR and Colvin, and summary judgment was proper. See Stone, 855 F.2d at 173; Glymph, 783 F.2d at 479.
 
 
 19
 The DHR through Colvin took two employment actions concerning Hooper: Colvin ordered Hooper to participate in the rotation program and Colvin accepted Hooper's request to transfer. Wheeler assigned Hooper to the Catonsville Income Maintenance Office position and promoted Hooper's secretary to another position. Wheeler also reassigned Hooper to the Towson Personnel position.
 
 
 20
 Hooper has conceded that the order to participate in the rotation program was not an adverse employment action. Hooper stated at deposition that Colvin could require his participation, whether or not he consented. The exchange program, by its terms, called for a six to twelve month assignment, after which Hooper would return to his former job, and during which time Hooper would maintain his Rank 19 salary. Requiring someone to participate in a rotational program is not, on the facts presented, an adverse employment action; it is a common employment requirement, in a program developed by the Maryland State Department of Personnel. Although Hooper has claimed that he believed his old job would no longer be available to him if he left for six to twelve months, he has adduced no evidence to establish the objective reasonableness of his personal belief. That creates no genuine issue of material fact, as a reasonable jury could not find that the exchange would become permanent based on Hooper's mere allegation, particularly in the face of the program's written requirement that exchanges shall be temporary.
 
 
 21
 It is disputed whether Colvin's order for Hooper to participate in the rotation program was motivated by racial animus. Viewing the evidence in the light most favorable to the nonmovant, Hooper, we take as true for summary judgment purposes that Colvin's motivation was racially-based. However, because a temporary rotation is not an adverse action, the disputed issue of fact is not material.
 
 
 22
 Colvin's acceptance of Hooper's voluntary request for a transfer may also have been motivated by racial animosity--if Hooper had been black, Colvin might have refused to allow him to transfer in the hopes that he would remain at DHR. However, that does not amount to a material fact because acceptance of a voluntary request to transfer is not an adverse employment action. E.g., Stone, 855 F.2d at 173; Glymph, 783 F.2d at 479. Hooper has admitted that he requested a transfer. The fact that he wanted to transfer because he did not want to participate in the rotation program does not make the transfer involuntary; Hooper has admitted that he was not constructively discharged, and a constructive discharge theory is the only legal theory upon which Hooper could show that his request to be transferred was involuntary.
 
 
 23
 Another dispute of fact highlighted by Hooper is not material. Through deposition, Wheeler, Colvin, and Colvin's secretary Lois Whitaker gave conflicting testimony as to when Colvin knew that Hooper was going to transfer rather than rotate. Colvin and Wheeler stated that Colvin discovered in October that Hooper wanted to transfer when Wheeler called Colvin for a reference for Hooper. Whitaker testified, however, that Colvin told Whitaker in September that Hooper would be transferring. Viewing the dispute in the light most favorable to the nonmovant, Hooper, we take as true that Colvin decided in September that Hooper would transfer, before Hooper actually requested a transfer. However, that does not create a genuine issue of material fact because there is no evidence that Colvin's purported decision to transfer Hooper was ever acted upon by Colvin--she never told him to transfer, she ordered him to rotate only. He then decided to transfer voluntarily. Hooper did not testify to having any knowledge, prior to the instant litigation, that Colvin had told Whitaker in September that Hooper would transfer. Thus Colvin's statement could not have coerced Hooper's decision to transfer voluntarily. Even if Colvin had been planning to transfer Hooper, she never had the opportunity to do so because Hooper volunteered first. Therefore, the disputed evidence does not create a genuine material issue.
 
 
 24
 Wheeler's assignment of Hooper to Catonsville may have been an adverse employment action, but there is no allegation or proof that it was motivated by racial discrimination. Viewing Hooper's deposition testimony in the light most favorable to him, Hooper voluntarily requested a transfer on two conditions: that he be given a "functionally commensurate" position, and that he be allowed to bring his secretary with him. Wheeler's promotion of Hooper's secretary, although perhaps a disappointment to him, could not itself have been an adverse employment action--a manager can not force a secretary to remain with the manager against the secretary's will. However, the Catonsville assignment presumably involved work substantively below that level at which Hooper had performed at DHR--the Caton sville position was Rank 15 and the DHR Director of Personnel position was Rank 19.* The Catonsville position involved managing people who were performing programmatic duties in the income maintenance field, rather than managing people who were performing personnel duties for all of DHR. Thus, viewing the evidence in the light most favorable to Hooper, we may take something of a leap and treat as true that Hooper's placement in Catonsville was an adverse employment action--a demotion.
 
 
 25
 However, Hooper has adduced no evidence that the choice of the Catonsville position by Wheeler was motivated by racial animus. Although Hooper's claim is against the entire DHR, not limited to animus by Wheeler, he has adduced no evidence that racial animus on the part of Colvin or anyone else played a part in Wheeler's choice of Catonsville. A potential scenario could exist under which a discriminator in one part of an employing organization could be motivated by discriminatory animus to ask a manager to subject an employee to an adverse employment action, and offers the manager nondiscriminatory but pretextual reasons for the action. In such a scenario, the employee who suffered the adverse action could state a claim even though the manager who performed the adverse action was not acting from personal animus, because ultimately, the action would have been motivated by discriminatory animus. Cf. Blackburn v. Martin, 982 F.2d 125, 130 (4th Cir.1992) (finding plaintiff failed to establish a "critical link in proof" where refusal of security clearance by one company was not shown to have been " caused " by discrimination of plaintiff's previous employer).
 
 
 26
 However, here there is no evidence that Colvin, the only person alleged to have discriminatory animus, directed Wheeler to assign Hooper to any particular position. Wheeler has stated that she chose the Catonsville position because the position required an experienced manager, which is what she believed Hooper to be. Wheeler informed Colvin that Wheeler would use Hooper as a manager, and Colvin possessed no further information about the position. Wheeler assigned Hooper to a managerial position. Thus, no genuine issue of material fact has been raised, because no reasonable juror could find that the adverse demotion to Catonsville was motivated by discriminatory animus.
 
 
 27
 Finally, Hooper has complained of his reassignment to Towson. The nature of the position to which he was reassigned is disputed, and, thus, viewing the evidence in the light most favorable to the nonmovant, Hooper, a reasonable jury could find that the Towson position was a demotion--both from DHR Director of Personnel and from the Catonsville Income Maintenance position. However, no discriminatory animus is alleged to have motivated Wheeler's choice of Towson. Hooper voluntarily demanded a personnel-related position rather than a management position in programs after he visited Catonsville, and Wheeler found the Towson position to meet Hooper's demands. There is no evidence that Colvin was involved in, or even was informed about, the assignment to the Towson position prior to Hooper's lawsuit. Thus, no reasonable jury could find that Hooper's transfer to Towson constituted employment discrimination.
 
 
 28
 Accordingly, the law having been correctly applied and there being no genuine disputed issue of material fact, the judgment is
 
 
 29
 AFFIRMED.
 
 
 
 *
 Hooper was to continue to be compensated as a Rank 19