Brian RAYMOND, Jane T. Raymond, and Christopher P. Jakubiak, Plaintiffs,

v.

CITY OF WORCESTER, Sh–Booms National, Inc., James Guittar and Michael Girouard, Individually and in their capacity as Police Officers for the City of Worcester, and Jason Dumas, Defendants.

No.  Civ.A. 99–40159–NMG.

United States District Court, D. Massachusetts.

April 24, 2001.

## MEMORANDUM AND ORDER

GORTON, District Judge.

This action arises out of the detainment, seizure and arrest of the plaintiffs, Brian Raymond ("Mr.Raymond"), Jane T. Raymond ("Mrs.Raymond") and Christopher Jakubiak ("Jakubiak"), by employees of the City of Worcester ("the City") and Sh–Booms National, Inc. ("Sh–Booms"). Plaintiffs brought this suit against the City, Sh–Booms and various individuals, alleging violations of their civil rights under federal and Massachusetts law, and numerous state-law tort claims. Now pending before this Court is the City's motion to dismiss Counts III and IV of the Second Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted (Docket No. 27).

### I. *Background*

For purposes of the pending motion to dismiss, the following background facts are stated in a light most favorable to the plaintiffs and as alleged by them. The facts are disputed by the defendants.

On the evening of September 20, 1997, Mrs. Raymond (then Jane Mioglionico), Mr. Raymond, and Jakubiak gathered with family and friends at Sh–Booms nightclub in Worcester, Massachusetts to celebrate the engagement of Mr. and Mrs. Raymond. That evening, while Mr. Raymond was drinking beers at the bar with Jakubiak, defendant Jason Dumas ("Dumas"), a security employee of Sh–Booms, approached him, grabbed his bottle, placed it on the bar and told him he was finished. Dumas forcibly pulled Mr. Raymond out of Sh–Booms with the aid of other Sh–Booms' employees and then informed defendant James Guittar ("Officer Guittar") that Mr. Raymond had been ejected because he had struck a woman in the establishment.

Once outside, Mr. Raymond waited for his fiancee and friends to join him so they could return home together. Officer Guittar, who was working a paid detail at Sh–Booms, approached him and asked what he was doing. Mr. Raymond responded that he was waiting for his friends. Officer Guittar then yelled expletives at Mr. Raymond, pushed him in the opposite direction from where his car was parked and ordered him to continue in that direction. Mr. Raymond complied and waited at the corner of the next street so that his fiancee and friends might see him when they left the nightclub.

While Mr. Raymond waited on the street corner, Officer Guittar and defendant Michael Girouard ("Officer Girouard") approached and asked him to explain what he was doing. After explaining that he was waiting for his friends, the officers cursed at Mr. Raymond and asked him if he liked to hit women. They then pushed and battered him, informed him that he was under arrest, dragged him to a nearby police cruiser and struck his head on the hood of that cruiser. The officers continued to punch Mr. Raymond while handcuffing him, sprayed him in the face with OC Spray and then placed him in a police wagon.

Mrs. Raymond approached the scene and observed the Officers hitting her fiancee. She pled with them to explain the situation, but they did not answer her questions and instead responded with vulgarities. While she watched, Officer Girouard lifted Mr. Raymond from the hood of the car and struck him in the face.

Subsequently, one of the officers sprayed Mrs. Raymond in the face with OC spray. The officers then handcuffed Mrs. Raymond and escorted her into a police wagon. While stepping into that wagon, one of the officers released his grip, causing Mrs. Raymond to fall backwards on to the ground. The officers then picked her up and threw her in the wagon.

Jakubiak, who stood in a crowd of on-lookers and witnessed the Raymonds being beaten, asked what was going on. As one officer ordered him to move back, the other sprayed OC spray into the crowd and into Jakubiak's face. Officer Guittar grabbed Jakubiak, accused him of striking a police officer and arrested him. He was then placed in the police wagon with the Raymonds.

The plaintiffs maintain that their mistreatment continued en route to and during their stay at the Worcester Police Station. The officer operating the wagon drove extremely fast and took sudden, sharp turns, causing them to be thrown about the passenger area. Once at the station, the plaintiffs were placed in filthy holding cells with urine-stained blankets, urine on the floor and rotting food and insects. The plaintiffs were not permitted to rinse their eyes to counteract the effects of the OC spray until the booking process began, approximately 90 minutes after their arrival at the police station.

Although Mr. Raymond was finally taken to the University of Massachusetts Medical Center one half-hour later, the Worcester police officer who transported him was rude and abrasive. In the trips to and from the hospital, that officer operated the police wagon at a very high rate of speed, taking sudden, sharp turns, which again caused Mr. Raymond to be bounced about the passenger area. Moreover, upon their arrival at the hospital, the officer pulled Mr. Raymond out of the wagon causing him to fall to the ground. The officer threatened to take Mr. Raymond back to the police station without the benefit of treatment unless he moved more quickly, despite the fact that he was handcuffed and in leg shackles at the time.

Following the events of that evening, the officers prepared allegedly false police reports stating, among other things, that Mr. Raymond assaulted Dumas in Sh–Booms and initiated the altercation with Officers Girouard and Guittar and that Jakubiak punched Officer Girouard. The Worcester Police Department also applied for and secured complaints against the plaintiffs on various criminal charges. Following a jury trial held in August, 1998 at which the Officers testified, the plaintiffs were acquitted of all criminal charges.

## II. *Discussion*

### A. Standard for Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only if it appears, beyond doubt, that the plaintiffs can prove no facts in support of their claim that entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must accept all factual averments in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir.1992). The Court is required to look only to the allegations of the complaint and if under any theory they are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. *Knight v. Mills*, 836 F.2d 659, 664 (1st Cir.1987).

### B. Municipal Liability under the Massachusetts Civil Rights Act

In Counts III and IV of the Second Amended Complaint, plaintiffs allege that

the defendants interfered with and conspired to interfere with their civil rights by threats, intimidation or coercion in violation of the Massachusetts Civil Rights Act, M.G.L. c. 12, §§ 11H and 11I ("the MCRA"). Section 11I provides, in pertinent part:

> Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate relief as provided for in said section, including the award of compensatory money damages.

M.G.L. c. 12, § 11I. Section 11H prohibits "any person or persons" from interfering with another's civil rights "by threats, intimidation, or coercion."

The City contends that Counts III and IV should be dismissed because it is not a "person" for purposes of § 11H and thus cannot be a defendant under the MCRA. Arguing by analogy to the federal counterpart of the MCRA, 42 U.S.C. § 1983, plaintiffs respond that a municipality is indeed a "person" under that statute.

██ A municipality is a "person" for purposes of § 1983. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). While not liable under § 1983 on a *respondeat superior* theory for the actions of its employees, a municipality can be sued if its employees were acting pursuant to an official policy or custom of the municipality when they inflicted the alleged injury. *Id.* at 690–94, 98 S.Ct. 2018. Because the Massachusetts Supreme Judicial Court ("SJC") has stated that the MCRA was intended to provide a remedy coextensive with § 1983, *see, e.g., Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822–23, 473 N.E.2d 1128 (1985); *Canney v. City of Chelsea*, 925 F.Supp. 58, 68 (D.Mass.1996), plaintiffs contend that the *Monell* theory of municipal liability applies with equal force to the MCRA.

██ The SJC has not yet determined whether a municipality is a "person" under the MCRA. *See Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 391, 668 N.E.2d 333 (1996)(declining to reach the question). This Court need not address that issue, however, because, even if the City is a "person" and thus subject to liability under the MCRA, plaintiffs have failed to state a claim under that statute.[1]

---

1. Without deciding the issue, this Court is persuaded that, although the MCRA parallels § 1983, significant differences between the two statutes counsel against treating them identically in all cases. *Chaabouni v. City of Boston*, 133 F.Supp.2d 93, 101 (D.Mass. 2001). For example, the MCRA reaches private actors and creates a cause of action only against interference with civil rights by "threats, intimidation or coercion". Section 1983, in contrast, requires state action and is not limited to civil rights violations by "threats, intimidation or coercion". *Id.*

Moreover, M.G.L. c. 4, § 7, cl. twenty-third provides that the word "person" when used in Massachusetts statutes "shall include corporations, societies, associations and partnerships." "There is nothing in the MCRA to indicate clearly that the Legislature did not intend the term 'person' to take on [that] statutory definition. . . ." *Sarvis v. Boston Safe Deposit & Trust Co.*, 47 Mass.App.Ct. 86, 96, 711 N.E.2d 911 (1999). Because the definitional statute does not mention municipalities, this Court concludes that municipalities cannot be sued under the MCRA. *Cf. Commonwealth v. ELM Medical Labs., Inc.*, 33 Mass.App.Ct. 71, 76–80, 596 N.E.2d 376 (1992)(holding that the Commonwealth is not a "person" for purposes of the MCRA due, in part, to the absence of the word "Commonwealth" in clause twenty-third); *see also Board of Health of Wrentham v. Hagopian*, 37

To establish a claim under the MCRA, the plaintiffs must prove that

> (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by "threats, intimidation or coercion."

*Id.*, 423 Mass. at 395, 668 N.E.2d 333. The SJC has defined "threats" as "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm", "intimidation" as "putting in fear for the purpose of compelling or deterring conduct" and "coercion" as "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done". *Planned Parenthood League of Massachusetts, Inc. v. Blake,* 417 Mass. 467, 474, 631 N.E.2d 985 (1994).

 The alleged actions of Officers Guittar and Girouard, clearly constitute "threats, intimidation or coercion" as defined by the SJC but only with respect to the liability of those officers in their individual capacities. Such actions are not relevant to determining the City's liability because the MCRA does not permit vicarious liability claims against municipalities. *Chaabouni v. City of Boston,* 133 F.Supp.2d 93, 103 (D.Mass.2001). Rather, indulging plaintiffs' assertion that the unconstitutional policy theory of municipal liability set forth in *Monell* should be applied, the City is liable only if Officers Guittar and Girouard were acting pursuant to an official policy or custom of the City when they violated the plaintiffs' civil rights. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018.

Plaintiffs allege that the City had a policy of failing to train, supervise or discipline its police officers and also of refusing to release reports of incidents similar to the instant case. Courts within the First Circuit have consistently held, however, that a municipality's failure to train, regulate, discipline or supervise its police officers is not actionable under M.G.L. c. 12, § 11I because such failure does not involve "threats, intimidation or coercion" by the municipality. *See, e.g., Sheehy v. Town of Plymouth,* 948 F.Supp. 119, 127 (D.Mass. 1996); *Armstrong v. Lamy,* 938 F.Supp. 1018, 1042 (D.Mass.1996); *Gross v. Bohn,* 782 F.Supp. 173, 185 (D.Mass.1991); *Curran v. City of Boston,* 777 F.Supp. 116, 122 (D.Mass.1991); *Hathaway v. Stone,* 687 F.Supp. 708, 711 (D.Mass.1988).

This Court finds that the holdings of the cited cases ought to be extended to an alleged municipal policy or custom of refusing to release reports regarding police misconduct. Accordingly, plaintiffs have failed to state a claim against the City of Worcester under the MCRA and the motion to dismiss those particular counts will therefore be allowed.

### ORDER

For the reasons set forth in the Memorandum above, defendant's motion to dismiss Counts III and IV of the Second Amended Complaint (Docket No. 27) is ALLOWED.

So ordered.

Mass.App.Ct. 174, 178, 638 N.E.2d 48 (1994)("[T]he word 'person' when used in a statute generally does not include municipalities.").