**Bruce BARON, Plaintiff,**

v.

**Daniel HICKEY, Suffolk County Sheriff's Department, and Sheriff of Suffolk County, Defendants.**

**No. CIV.A.01–10143–PBS.**

United States District Court,
D. Massachusetts.

Jan. 31, 2003.

---

Carolyn Conway, DiMento & Sullivan, Boston, for Bruce Baron, Plaintiff.

Stephen C. Pfaff, Douglas I. Louison, Merrick, Louison & Costello, Kathleen M. Cawley, Suffolk County Sheriff's Department, Boston, for Daniel Hickey, Suffolk County Sheriff's Department, Sheriff of Suffolk County, Suffolk County Sheriff's Department, Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### INTRODUCTION

Plaintiff Bruce S. Baron, a corrections officer at the Suffolk County House of Correction, alleges he was harassed and forced to quit because he broke a "code of silence" when he reported a fellow officer's misconduct. He asserts claims under 42 U.S.C. § 1983 and state law. Defendants Richard Rouse, Sheriff of Suffolk County ("Rouse"), and the Suffolk County Sheriff's Department ("the Department") move for summary judgment. After hearing, the motion is *ALLOWED* in part and *DENIED* in part.

### UNDISPUTED FACTS

When all reasonable inferences are drawn in plaintiff's favor, the Court treats the following facts as undisputed, except where otherwise stated. Some of these facts are hotly disputed.

Plaintiff Baron was hired on December 7, 1995 by the Suffolk County House of Correction as a corrections officer. Defendant Rouse became Sheriff in October 1996. On January 27, 1997, Baron ob-

served another corrections officer, Sgt. Curtis, a supervisor, playing cards with a group of inmates, a violation of the institution's policies. Peeved at Curtis's laziness, a supervisor instructed Baron to report the matter, and he did so, albeit reluctantly because he knew the likely consequences of breaking the code of silence concerning another officer's misconduct. Sgt. Curtis received a three-day suspension as a result of Baron's report. Baron's co-workers began to harass him on a daily basis when they learned that he had filed this report.

The chief protagonist was Defendant Hickey, also a corrections officer, who harassed, threatened, and intimidated Baron on numerous occasions. On September 13, 1997, Hickey came to Baron's table at the cafeteria saying, "Excuse me, this is for the rat fink." Hickey threw cheese onto Baron's plate, splattering the food onto Baron's uniform, and tried prodding him into a fight by saying he was a "low down Jewish rat bastard coward." There were other instances in which Hickey referred to Baron as a "rat fink" and a "rat coward," and once said that he, Hickey, would, "be the one to beat the shit out of" Baron. Hickey denies being the ring leader of this harassment. His version of the September 13th incident is that Baron walked by him and said hello. When Hickey refused to answer, Baron responded: "Oh, you don't talk to me either like the rest of those fucking punks." In the cafeteria, Hickey thought Baron called him a punk again. When Hickey replied, "Did I hear a squeak?" Baron replied, "Hey, Hickey, why don't you do us all a favor and commit suicide or kill yourself." Hickey repeated, "Did I hear a squeak?" Hickey explained he wanted to avoid any conversation with Baron because of rumors that he was a rat. Under either version, Baron was being ostracized and taunted for reporting the misconduct.

Other forms of harassment include defamatory and threatening posters that were taped to Baron's locker and in the staff locker room—one of which stated that Baron watched child-pornography at work—threatening phone calls, smearing of feces on his car, and the slashing of his tires. Baron also submitted a poster which he interpreted as depicting an elevator shaft with language suggesting he would be pushed down the shaft. Superior officers observed some of the harassment, but did nothing to halt it. Baron was transferred to the night shift on or about October 15, 1997, in an effort to avoid further harassment, but to no avail.

Baron verbally complained of this harassment on thirty occasions, and in writing he submitted twenty complaints, to his supervisors at the Sheriff's Department. With respect to the September 13, 1997 incident, he submitted two written complaints, on September 15 and September 16, 1997, one of which was with the Sheriff's Investigative Division ("SID"). He claims that the SID lost the other written complaints, and he did not keep copies. Neither report mentioned harassment based on religion. In January, 1998, Baron met with Deputy Superintendent Lugelow. Lugelow interviewed Hickey (who denied harassing Baron) and ordered him to cease the harassment. Hickey was not disciplined. On another occasion, when Baron reported an anonymous harassing phone call, his supervisor told another corrections officer to cease if he was the one making the call. Nothing more was done to stop the harassment. On one occasion, a superior responded to Baron's complaint by telling him to "be a man." Defendants contend that both complaints were adequately addressed, and that they had an anti-harassment policy in place.

Baron himself began getting into trouble. On December 9, 1997, a female in-

mate alleged the plaintiff sexually assaulted her and an internal investigation ensued. A criminal complaint was filed for indecent assault and battery on a person over 14 in violation of Mass. Gen. L. ch. 265, § 13H. Plaintiff was acquitted and claims the charges were trumped up in an effort to discredit him. Plaintiff was also given a 5–day suspension for giving food (sandwiches and candy) to a female inmate in violation of department policy.

On February 24, 1998, plaintiff was taken ill at work and was sent to the hospital, but later returned to work. On August 13, 1998, he received a 20–day suspension until August 11, 1998 for receiving a written communication from an inmate which he did not report immediately, but instead filed with the Boston Police. Essentially an inmate told Baron that his 15–year old girlfriend had been sexually assaulted by an upstairs neighbor and Baron filed the report directly with the police, rather than notifying his supervisor.

According to the Superintendent of the Suffolk County House of Correction, Richard James Feeney, a "code of silence" existed among the corrections officers in the institution in 1997 and 1998. This "code of silence" requires officers to refrain from reporting each other for violations of the institution's policies. Baron claims he suffered harassment as a result of breaking the code. Baron alleges that this "code of silence" is known and tolerated by both the Department and Sheriff Rouse.

Baron resigned in September 1998, claiming he was forced to resign by the unremitting harassment, which was taking a psychological toll. Defendants claim he resigned rather than face the 20–day suspension imposed on August 11, 1998.

## STANDARD OF REVIEW

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

## DISCUSSION

### A. Alleged Constitutional Violations

To prevail on a claim under 42 U.S.C. § 1983, Baron must show that he has suf-

fered a violation of his constitutionally protected rights. He claims (1) that he was constructively discharged in retaliation for his exercise of First Amendment rights; (2) that he was deprived of his property interest in his job in violation of the due process clause; and (3) that defendants permitted a hostile work environment because of his religion.

## 1. First Amendment Claim

◼ Plaintiff claims that he was discharged in retaliation for his report of the wrong-doing of his fellow corrections officer and in retaliation for his complaints to the sheriff regarding the co-worker harassment against him for being a "snitch."

The First Circuit has recently summarized that to prevail on a First Amendment claim of this nature plaintiff, "as a public employee, must establish that (1) his expression involved matters of public concern; (2) his interest in commenting upon those matters outweighed the City's interests in the efficient performance of its public services; and (3) his protected speech was a substantial or motivating factor in the City's adverse employment actions." *Lewis v. City of Boston*, 02–CV–1495, 2003 WL 174887 at *7 (1st Cir. Jan.28, 2003); *see also Mullin v. Town of Fairhaven*, 284 F.3d 31, 37–38 (1st Cir. 2002); *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

◼ Absolute First Amendment protection is not accorded to the speech of a public employee regarding his employment without regard to content. The threshold question is thus whether the employee was speaking as a citizen upon matters of public concern, or, alternatively, as an employee upon matters only of personal interest:

> Where a public employee speaks out on a topic which is clearly a legitimate matter of *inherent* concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the "form and context" of the expression.... On the other hand, public-employee speech on a topic which would not necessarily qualify, *on the basis of its content alone*, as a matter of inherent public concern (e.g., internal working conditions, affecting only the speaker and co-workers), may require a more complete *Connick* analysis into the form and context of the public-employee expression, "as revealed by the whole record," ... with a view to whether the community has in fact manifested a legitimate concern in the internal workings of the particular agency or department of government, and, if so, whether the "form" of the employee's expression suggests a subjective intent to contribute to any such public discourse.

*O'Connor v. Steeves*, 994 F.2d 905, 913–14 (1st Cir.1993) (emphasis in original).

The question here is whether the report about the misconduct of a corrections officers at the Suffolk County House of Correction is of inherent interest to the public. *Connick* provides important guideposts here. On the one hand, the Supreme Court held that speech about confidence and trust in supervisors, the level of office morale, and the need for a grievance committee did not raise matters of substantial public concern because it was rooted in the employee's personal dissatisfaction with a job transfer. 461 U.S. at 148, 103 S.Ct. 1684. On the other hand, questions about whether public employees felt pressured to work in political campaigns was deemed "a matter of interest to the community upon which it is essential that public employees

be able to speak out freely without fear of retaliatory dismissal." *Id.* at 149, 103 S.Ct. 1684. The Supreme Court gave as an example of an area of public concern a situation where an employee seeks to bring to light "actual or potential wrongdoing or breach of public trust" on the part of public employees. *Id.* at 148, 103 S.Ct. 1684.

Here, the initial report of co-worker wrongdoing was not rooted in plaintiff's personal employment situation. Therefore, it does not fall into the category of "personal interest," which the Supreme Court carved out as speech that is generally not constitutionally protected. On the other hand, the minimal level of employee wrongdoing—playing cards with an inmate—does not seem to arise to the level of breach of a public trust, even though it may well be a violation of an internal rule. Moreover, Baron's personal motivation was not to contribute to the public discourse, but rather was to comply with the instruction of a superior.

■ Of greater concern is the alleged supervisory tolerance of a pattern of escalating co-worker harassment launched against a corrections officer for reporting an infraction by a fellow officer in a prison setting and then complaining about the harassment. It is apparent that the issue of whether a corrections officer is willing to "walk the blue line" to report wrongdoing within the prison walls is a matter of great interest to the community, and the courts. This problem is analogous to the situation in which a public employee feels pressured to work in a political campaign, which the Supreme Court discussed in *Connick*. It is essential that corrections officers be able to speak out freely about misconduct without the pressure of a "code of silence" and fear of extreme retaliatory harassment sufficient to force resignation. *See* Myriam E. Gilles, *Breaking the Code of Silence: Rediscovering "Custom" in*

*Section 1983 Municipal Liability*, 80 B.U. L.Rev. 17, 63–67 (2000) (describing depth and pervasiveness of problem of codes of silence in law enforcement).

The community has in fact manifested a legitimate concern in the internal workings of the Sheriff's Department. This concern was recently heightened when seven indictments issued in 2000 against two corrections officers for excessive force. *See e.g. U.S. v. Eric J. Donnelly and William Benson,* (Crim. No. 00–10431–RCL). *See also,* Francie Latour and Thomas Farragher, *Sexual Abuse in Suffolk Prison,* Boston Globe, May 23, 2001, at A1 (first of a series of Globe articles chronicling concerns about inmate abuse and mismanagement at the Suffolk County House of Correction). At the Sheriff's request, a Commission was formed by Governor Jane Swift in the fall of 2000 in response to mounting allegations of inmate abuse, patronage, and mismanagement. *See generally Report of the Special Commission on the Suffolk County Sheriff's Department* ("The Stern Report," named after its Chair, Donald Stern, the former United States Attorney). This report recommended that "the Department should take steps to become more open and increase its internal and external accountability. *The Commission urges an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members.*" *Id.* at 9 (Emphasis added).

■ Finally, defendants argue that plaintiff was not discharged by the County, but rather resigned. However, extreme harassment in retaliation for protected speech that results in constructive discharge can constitute a claim under § 1983. *See Jeffes v. Barnes,* 208 F.3d 49, 64 (2d Cir.2000) (overturning dismissal of § 1983 case brought by corrections officer subject to harassment for statements made

to news media and federal investigators concerning other officers' treatment of inmates).

## 2. Due Process Claim

■ The essence of plaintiff's Due Process claim is that a county employee has a property interest[1] in his employment that cannot be taken from him without due process of law. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–39, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985) (holding that state employees have a property interest in their employment which cannot be taken from them without due process of law). Although plaintiff resigned, he argues that the harassment to which he was subjected constituted a constructive dismissal without due process. The Fourth Circuit has recognized a constructive-discharge theory of a due process violation:

> [T]here is no question that [plaintiff] had a constitutionally protected "property" interest in his continued employment ... as he could be discharged from each position only for cause. But that leaves the more difficult question whether he was "deprived" of that interest by some form of state action. Had he been officially discharged from his public employment, the answer would be evident. But [plaintiff]'s superiors never officially "fired" him—he resigned. If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state "deprived" him of it within the meaning of the due process clause.... If, on the other hand, [plaintiff]'s "resignation" was so involuntary that it amounted to a constructive discharge, it must be con-

sidered a deprivation by state action triggering the protections of the due process clause. A public employer obviously cannot avoid its constitutional obligation to provide due process by the simple expedient of forcing involuntary "resignations." The proper focus of the constitutional inquiry here is therefore on the voluntariness of [plaintiff]'s resignation.

*Stone v. University of Maryland Medical System Corp.,* 855 F.2d 167, 172–73 (4th Cir.1988) (citations and footnotes omitted). *See also Hargray v. City of Hallandale,* 57 F.3d 1560, 1567–68 (11th Cir.1995) (adopting and applying *Stone* where plaintiff resigned involuntarily after being given choice of resigning or facing criminal charges for misappropriating city property); *Hurney v. Boston Redevelopment Authority,* 94–CV–12313–GAO, 1996 WL 208475, *3 (D.Mass.1996) (citing *Stone* for the proposition that "if [plaintiff's] resignation was in effect involuntary for reasons that would make it tantamount to a constructive discharge, then 'it must be considered a deprivation by state action triggering the protections of the due process clause.'") (citation omitted); *Lewis v. Boston Redevelopment Authority,* 94–12103–GAO, 1996 WL 208473, *4 (D.Mass. 1996)(same).

■ Thus the question becomes whether Hickey voluntarily resigned or was constructively discharged. "As an initial matter, employee resignations are presumed to be voluntary." *Hargray,* 57 F.3d at 1568. "Those circuits that have addressed whether a resignation was involuntary agree that the court must examine the surrounding circumstances to test the ability of the employee to exercise free choice." *Id.* (citations omitted). Baron

---

1. While defendants' brief is not crystal clear on this point, they seem to concede that plaintiff has a property interest in the job because

he was not an at-will employee and could be fired only for cause.

alleges constructive discharge by reason of working conditions rendered so intolerable as to remove any real choice from the plaintiff as to whether or not to remain in his job. The "surrounding circumstances" analysis here then must ask whether the conditions were such that a reasonable person could not be expected to remain at the job, that is, whether the plaintiff reasonably felt he had no choice but to resign.

There are disputed facts concerning the circumstances that surrounded plaintiff's employment and resignation. The parties disagree as to the extent and nature of the harassment, the number of complaints lodged by plaintiff, the defendants' response to such complaints, and even the actual reason for plaintiff's resignation. If a jury believed all of Baron's allegations, they could reasonably find that his resignation was not voluntary.

### 3. Religion

■ At most, plaintiff alleges one incident when his religion was mentioned by one person. This isolated anti-Semitic comment is insufficient to support a claim of hostile work environment based on religion. Indeed, plaintiff does not press the argument in his brief but mentions it only *in passim.*

### B. County Liability

■ To make his § 1983 claim against the Sheriff and the Department, Baron must show that they sanctioned an official policy or a "custom" or unofficial policy that resulted in the denial of Baron's civil rights. *See Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989) (stating requirements for bringing a § 1983 action against a municipality based on municipal officials' maintenance of an unconstitutional "custom").

■ Plaintiff, of course, complains of harassment on the part of co-workers, not by defendants directly. Municipalities may not be held liable under a respondeat superior theory for the § 1983 violations of their employees. *Monell v. Dep't. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To hold these defendants liable then, plaintiff must show that his constructive discharge was the result either of an official policy, or of a custom "so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod,* 871 F.2d at 1156 (finding municipality liable for civil rights abuses of its police officers).

Plaintiff alleges that defendants knew of and failed to end a custom in the jails of employee-employee harassment for breaching an unwritten "code of silence," which sought to inhibit officers from reporting each other's malfeasance. Plaintiff in fact alleges that it was this deliberate indifference on the part of defendants, their refusal to put an end to the harassment, that forced him to resign.

The parties dispute the facts concerning the existence of a custom or unofficial policy of sanctioning employee-employee harassment. Defendants deny that they acquiesced in or failed to act to prevent the harms associated with the alleged "code of silence." Plaintiff points to the deposition testimony of Deputy Superintendent Feeney regarding his knowledge of the "code of the silence" in the jail system, and highlights the Stern Report. Defendant contends that the report is inadmissible as hearsay. Plaintiff relies on Fed.R.Evid. 803(8)(c) that provides an exception to the hearsay rule relating to "factual findings resulting from an investigation made pursuant to authority granted by law." *See Gentile v. County of Suffolk,* 926 F.2d 142, 148 (2d Cir.1991) (upholding ruling admitting portions of investigative

report into alleged abuses at police department into evidence); *Montiel v. City of Los Angeles,* 2 F.3d 335, 341–42 (9th Cir. 1993) (overturning trial court's cursory refusal to admit investigative report concerning systemic civil rights abuses in the police department). While plaintiff must provide a sufficient foundation for admission of the Stern Report in evidence to demonstrate its trustworthiness at a voir dire, the Stern Report does lend great weight to plaintiff's argument of a custom or policy condoning a code of silence, as well as the inadequacy of the SID in investigating complaints because of poor training and understaffing. If a jury believed all of plaintiff's allegations, they would not be unreasonable in concluding that he was constructively discharged because of a custom of turning a blind-eye to employee-employee harassment in retaliation for speaking out in violation of the "code of silence." As such, the motion for summary judgment on the claim against the County on his due process claim is ***DENIED.***

### D.  Sheriff Rouse's Qualified Immunity

Defendant Rouse claims that he is entitled to summary judgment because he enjoys qualified immunity from suit against plaintiff's § 1983 claims.

"Qualified immunity protects public officials from section 1983 civil liability so long as they 'acted reasonably under settled law in the circumstances.' " *Veilleux v. Perschau,* 101 F.3d 1, 2 (1st Cir.1996) (per curiam) (quoting *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). The doctrine protects officers and ensures that before they are subjected to suit, "officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001).

The Supreme Court has set out a two-part test for determining whether an official is entitled to qualified immunity. *See Saucier,* 533 U.S. at 200–09, 121 S.Ct. 2151. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201, 121 S.Ct. 2151. If so, the second step requires examining "whether the right was clearly established." *Id.*

"Qualified immunity shields government officials performing discretionary functions from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Febus–Rodriguez v. Betancourt–Lebron,* 14 F.3d 87, 91 (1st Cir. 1994) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "On a motion for summary judgment, 'the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.' " *Febus–Rodriguez,* 14 F.3d at 91 (citation omitted). "If the right the government allegedly violated was clearly established at the time of the challenged conduct, 'the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.' " *Lynch v. City of Boston,* 180 F.3d 1, 13 (1st Cir. 1999) quoting *Harlow,* 457 U.S. at 818–819, 102 S.Ct. 2727.

With respect to step one of the qualified immunity analysis, Defendant Rouse argues that, unlike in *Jeffes,* he did not engage in any conduct that harassed plaintiff, and did not actually know about the harassment. However, the liability of supervisory officials does not depend on their personal participation in the acts of

their subordinates which immediately brought about the violation of the plaintiff's constitutional rights. *See Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir.1985). The failure of the Sheriff to supervise and discipline officers for misconduct can establish a municipal liability claim. *Id.* at 820. Deliberate indifference or willful blindness to an unconstitutional custom or practice can also lead to liability. *See Camilo–Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir.1998). "[I]t is well established that a municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's acquiescence in a long standing practice or custom which constitutes the 'standard operating procedure' of the local entity." *Jeffes*, 208 F.3d at 61 (citations omitted).

Plaintiff, however, has produced insufficient evidence to support a claim that the Sheriff acquiesced in the code of silence in 1997 and 1998. To be sure, the Sheriff took a laissez-faire management style, and did not work directly in the institutions. However, he had little experience in the field, and did not begin working for the Department until October 1996. Much of the harassment took place in 1997, at the beginning of his tenure. Plaintiff has not shown any incident, report, complaint or testimony that demonstrates that the Sheriff was on notice of the code of silence and the need to address it in 1997 and 1998. There is no evidence he knew about retaliatory harassment against other employees, saw posters, or took any actions to condone any of it. The incidents giving rise to the criminal indictments against corrections officers occurred in 1998 and 1999. Thus, while there is evidence that the Suffolk County House of Correction had a widespread custom and practice of tolerating a code of silence, based on this record, I conclude that the Sheriff's hands-off management style did not arise to the level of willful blindness or deliberate indifference to the code of silence during the relevant time period.

## II. State Claims

### A. State Civil Rights Claim

■ To prove a claim under Mass. Gen. L. ch. 12, § 11H and 11I, the MCRA plaintiff must show that his rights were "interfered with" by "threats, intimidation or coercion." *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395, 668 N.E.2d 333, 337 (1996). "Courts within the First Circuit have consistently held, however, that a municipality's failure to train, regulate, discipline or supervise its police officers is not actionable under [the MCRA] because such failure does not involve 'threats, intimidation or coercion' by the municipality." *Raymond v. City of Worcester*, 142 F.Supp.2d 145, 149 (D.Mass.2001) (listing cases).

■ Plaintiff's claim, which is not briefed, appears to be predicated on a charge that the county failed to "train, regulate, discipline or supervise" its corrections officers and supervisors. Such a claim is not cognizable under First Circuit precedents, and the motion for summary judgment on plaintiff's MCRA claims is therefore *ALLOWED*.

### b. Constructive Discharge Claim

■ To prove his common law claim of constructive discharge on state law grounds, "the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.... The test is met if, based on an *objective* assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable." *GTE Products Corp. v. Stewart*, 421 Mass.

22, 34, 653 N.E.2d 161, 168 (1995) (citation omitted, emphasis in original). Again, the parties in the case at bar dispute the facts concerning plaintiff's working conditions. If a jury believed all of Baron's allegations, they could reasonably find that the conditions of his employment were intolerable.[2] Therefore, summary judgment on plaintiff's constructive discharge claim must be **DENIED.**

### ORDER

The Motion for Summary Judgment by the County is **ALLOWED** with respect to the Massachusetts Civil Rights Act claim, but **DENIED** with respect to the remaining claims. The Sheriff's Motion for Summary Judgment on the ground of qualified immunity is **ALLOWED.**

---

**2.** Defendants make passing reference to a collective bargaining agreement but do not make an argument that it precludes this common law claim.