**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2041**

SAUL HILLEL BENJAMIN,

Plaintiff - Appellant,

v.

NICHOLAS SPARKS; EPIPHANY SCHOOL OF GLOBAL STUDIES;
NICHOLAS SPARKS FOUNDATION,

Defendants - Appellees,

and

MISSY BLACKERBY; TRACY LORENTZEN; KEN GRAY,

Defendants.

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.  James C. Dever III, District Judge.  (4:14-cv-00186-D)

Argued:  October 28, 2020                         Decided:  January 19, 2021

Before KING, WYNN, and THACKER, Circuit Judges.

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge King and Judge Thacker joined.

**ARGUED:** Lawrence M. Pearson, WIGDOR LLP, New York, New York, for Appellant. Richard Leonard Pinto, PINTO, COATES, KYRE & BOWERS, PLLC, Greensboro, North Carolina; Hayden J. Silver, III, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Michael J. Willemin, Hilary J. Orzick, WIGDOR LLP, New York, New York; Kristen E. Finlon, ESSEX & RICHARDS, PA, Charlotte, North Carolina, for Appellant. Theresa M. Sprain, Jonathon D. Townsend, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellees Nicholas Sparks and The Nicholas Sparks Foundation. Deborah J. Bowers, PINTO, COATES, KYRE & BOWERS, PLLC, Greensboro, North Carolina, for Appellee Epiphany School of Global Studies.

WYNN, Circuit Judge:

Saul Hillel Benjamin, the former headmaster of the Epiphany School of Global Studies ("Epiphany School"), sued Epiphany School, its founder Nicholas Sparks, the Nicholas Sparks Foundation (the "Sparks Foundation"), and Epiphany School Board of Trustees members Missy Blackerby, Tracy Lorentzen, and Ken Gray (collectively "Defendants"). Benjamin alleged various acts of unlawful discrimination and retaliation, breach of contract, and tortious injuries. The district court dismissed some of Benjamin's claims and granted Defendants' motions for summary judgment on others. At trial, the jury returned a verdict for Defendants on Benjamin's remaining claims.

On appeal, Benjamin asks this Court to find that the district court abused its discretion in its evidentiary and trial-management rulings. He also appeals the district court's dismissal of his claims against Lorentzen and Gray as well as the court's order granting in part and denying in part Defendants' motion for summary judgment. We affirm.

I.

A.

Epiphany School is a private, non-denominational, faith-based school in New Bern, North Carolina serving students from kindergarten through twelfth grade. Sparks founded Epiphany School in 2005. Defendants Blackerby, Gray, Lorentzen, and Sparks all serve on Epiphany School's Board of Trustees (the "Epiphany School Board"), and Sparks is the chair of the Epiphany School Board. Separate from Epiphany School and the Epiphany

School Board is the Sparks Foundation, a non-profit corporation that raises scholarship money for Epiphany School students and supports the school.

In 2012, the Epiphany School Board hired a recruiting firm to search for a new headmaster. The firm recommended Benjamin as a candidate prompting Benjamin and his wife at the time, Dr. Jennifer Dueck, to visit New Bern twice and meet with the Epiphany School Board and Epiphany School students, parents, faculty, and staff.

During these meetings, Epiphany School community members "evaluated Benjamin on various criteria[,] including 'Christian Tradition.'" J.A. 3993–94.[1] Benjamin, who describes himself as a Quaker of Jewish ethnicity, alleges that he was asked by the Epiphany School Board members many times to explain and describe his religious upbringing and beliefs. He further alleges that he was told by Lorentzen that members of the Epiphany School community did not see him as a "true Christian" because "Quakers are really not Christians." J.A. 2769.

In February 2013, Benjamin was hired as headmaster of Epiphany School. Benjamin entered into two contracts following his hiring: one with Epiphany School to serve as the headmaster and one with the Sparks Foundation to serve as an independent contractor. Both contracts were for a four-year term, but Defendants could terminate the contracts under preset conditions. Benjamin's employment agreement with Epiphany School noted that the agreement would terminate if he resigned or if he was terminated with or without cause.

---

[1] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

Benjamin's contract with the Sparks Foundation provided that the Sparks Foundation could cancel the agreement upon thirty days' written notice to Benjamin for any reason.

From the beginning, Benjamin's time at Epiphany School was marked by conflicts with Epiphany School students, parents, faculty, and staff. The parties disagree about the role Benjamin played in causing these conflicts.

According to Defendants, Benjamin was condescending and hostile to faculty and staff; inattentive to important deadlines and the school's younger students; and frequently absent from school events. According to Benjamin, however, his conflicts with the Epiphany School community were driven by their hostility toward his Jewish background, Quaker faith, and his efforts to promote diversity on campus.[2]

In October 2013, the Epiphany School Board began to express frustration with Benjamin. At their monthly meeting with Benjamin, the Epiphany School Board discussed the challenges he had been experiencing at Epiphany School, as well as his successes, in the hope that the situation would improve.

But in the weeks following that meeting, Benjamin's relationship with the Epiphany School community further deteriorated. Accordingly, on November 18, 2013, Sparks sent

---

[2] Benjamin alleges that his tenure at Epiphany School included repeated efforts to support and expand diversity amongst the student and faculty populations. Those efforts included actively recruiting African-American students and faculty, including Epiphany School's first full-time African-American faculty member; supporting students being bullied on the basis of their sexual orientations or gender identities; and advocating for a new and comprehensive non-discrimination policy.

an email to the Epiphany School Board detailing the formal grievance process for employees and noting that he did not want to pay the remainder of Benjamin's salary.

The next day, the Epiphany School Board held a forum attended by faculty and parents at which Benjamin gave a speech explaining his religious beliefs. The parties disagree as to whether this speech was voluntary. Benjamin contends that giving the speech went against his core religious obligation, as a Quaker, to practice his faith privately.

Following Benjamin's speech, Epiphany School Board member Gray explained the formal grievance process to the audience, and Benjamin alleges that Sparks solicited grievances from Epiphany School parents. The same day, Sparks emailed the Epiphany School Board saying that he needed "faculty evidence of terminable offenses." J.A. 4000. He also told Gray that "we're going to try to get Benjamin to resign voluntarily." *Id.*

Two days later, Benjamin met with Sparks, Gray, and Lorentzen in a conference room at Epiphany School. The parties are in considerable disagreement as to what happened next.

Benjamin alleges that he was berated and prevented from leaving the conference room during the entirety of the meeting, which lasted between ninety minutes and two hours. According to Benjamin, he was told that he was being fired from Epiphany School; that his contract with the Sparks Foundation was being terminated; and that if he left the room, he would be terminated for cause. On the other hand, Sparks maintains that the meeting was an attempt to negotiate the terms of Benjamin's resignation, and contends that

6

Benjamin was offered the choice to either resign with severance[3] or risk being terminated for cause.

Dueck—who at the time was Benjamin's wife and was employed by the Sparks Foundation—joined the meeting after approximately forty-five minutes. Defendants argue that once Dueck joined the meeting, Benjamin negotiated the terms of his resignation and signed his own handwritten letter of resignation. By contrast, Benjamin contends that Gray instructed him to write the resignation letter and told him what to say in it.

Following that meeting, Benjamin emailed the recruiter who had recommended him to Epiphany School to notify the recruiter of his "resignation as Headmaster & CEO of [the school]," indicating that the position was not a good fit for either party and thanking the recruiter for his efforts. J.A. 8435. The following day, the Epiphany School Board notified Benjamin that his contract with the Sparks Foundation had been terminated. And on November 25, the Epiphany School Board sent Benjamin an updated letter referring to his "resignation" rather than his "termination."

Benjamin alleges that Sparks subsequently began circulating rumors by telling the Epiphany School Board that Benjamin "may be suffering from dementia or Alzheimer's or something along those lines because [Benjamin] just did not appear rational in his actions." J.A. 4002 (alteration in original). Additionally, he alleges that Sparks told an Epiphany

---

[3] At trial, Benjamin acknowledged that financial compensation was offered, but "d[id not] recall the word 'severance'" being used, a word he considered to be a "term of art." J.A. 7161.

School parent that he "had to terminate Mr. Benjamin because Mr. Benjamin had dementia and bipolar disease" and that "bipolar disease runs in Mr. Benjamin's family." *Id.*

B.

On October 2, 2014, Benjamin sued Sparks, Epiphany School, the Sparks Foundation, Blackerby, Lorentzen, and Gray in the Eastern District of North Carolina. On May 28, 2015, he filed an amended complaint alleging sixteen counts: Count I (all Defendants—unlawful discrimination in violation of 42 U.S.C. § 1981); Count II (all Defendants—unlawful retaliation in violation of § 1981); Count III (Epiphany School—religious discrimination in violation of Title VII); Count IV (Epiphany School—race discrimination in violation of Title VII); Count V (Epiphany School—national origin discrimination in violation of Title VII); Count VI (Epiphany School—discrimination in violation of the Americans with Disabilities Act); Count VII (Epiphany School—unlawful retaliation in violation of Title VII); Count VIII (Epiphany School—breach of contract); Count IX (the Sparks Foundation—breach of contract); Count X (Sparks—defamation *per se*); Count XI (Sparks—defamation); Count XII (Sparks—tortious interference with prospective economic relations); Count XIII (Epiphany School and Sparks—tortious interference with a contract); Count XIV (Sparks, Gray, and Lorentzen—false imprisonment); Count XV (Sparks—assault); and Count XVI (all Defendants—retaliation in violation of the School Violence Prevention Act, N.C. Gen. Stat. § 115C-407.15).

On March 23, 2016, the district court dismissed Count I and II as to defendants Blackerby, Lorentzen, and Gray; Counts V, XII, and XIII in their entirety; Count XIV as

to Lorentzen and Gray; and Count XVI in its entirety. With no claims remaining against Blackerby, Lorentzen, or Gray, the court dismissed them from the lawsuit.

The remaining defendants—Sparks, Epiphany School, and the Sparks Foundation—moved for summary judgment on the outstanding claims. The district court granted in part and denied in part their motion, leaving four claims to go to trial: discrimination in violation of the Americans with Disabilities Act of 1990 against Epiphany School (Count VI); breach of contract against Epiphany School (Count VIII); breach of contract against the Sparks Foundation (Count IX); and defamation *per se* against Sparks (Count X).

In a case management order, the district court ordered that each party provide the other party with pretrial disclosures required under Federal Rule of Civil Procedure 26(a)(3) by July 1, 2019.[4] In their timely filed disclosures, Defendants designated Dueck—who is a Canadian citizen and who was, by that time, residing in Canada—as a witness by deposition testimony, meaning she would not be called to testify at trial. Benjamin objected to this designation because he anticipated calling Dueck to testify at trial via videoconference. However, on July 15, 2019, he indicated that he would instead introduce her deposition testimony. But the district court prevented Benjamin from introducing any of Dueck's deposition testimony, finding that Benjamin's designation was not in compliance with the time frame established by the case management order.

---

[4] Rule 26(a)(3) governs pretrial disclosures of evidence and the timeline for such disclosures.

A six-day trial commenced on August 14, 2019, and each side was allowed fourteen hours to present its case. At trial, the district court admitted—over Benjamin's objection—evidence that Benjamin had misrepresented his employment history and credentials to Epiphany School prior to being hired. The court also instructed the jury on the breach-of-contract and defamation *per se* claims using instructions to which Benjamin objected.

The jury returned a verdict for Defendants on all claims. This appeal followed.

On appeal, Benjamin primarily asks this Court to find that the district court abused its discretion by (1) preventing Benjamin from introducing Dueck's deposition testimony; (2) implementing time limits for each side's presentation of its case; (3) admitting evidence about Benjamin's misrepresentations regarding his prior employment; and (4) declining to adopt Benjamin's proposed jury instructions and verdict form for the breach of contract and defamation *per se* claims. We conclude that the district court did not abuse its discretion regarding any of these decisions. Accordingly, we affirm.

II.

We first consider Benjamin's challenge to the district court's decision to exclude the deposition testimony of one of his witnesses, his ex-wife Dueck. Federal Rule of Civil Procedure 26(a) establishes the disclosures that parties must make prior to trial and the timeline for those disclosures, including, as relevant here, that pretrial disclosures must be made at least thirty days before trial. Fed. R. Civ. P. 26(a)(3)(B). Furthermore, under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P.

37(c)(1). The district court concluded that Benjamin failed to comply with Rule 26(a), that the failure was neither substantially justified nor harmless, and thus that exclusion was proper.

"We review for an abuse of discretion both the district court's finding of a disclosure violation and its decision to exclude evidence as a discovery sanction." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). We adopt this deferential review because "the district court has an intimate familiarity with the relevant proceedings and, therefore, is in a superior[] . . . position to supervise the litigants and assess their good faith." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 208 (4th Cir. 2017) (Wynn, J., concurring in part and dissenting in part) (citations and internal quotation marks omitted).

Here, despite a case management order establishing a July 1, 2019 deadline for pretrial disclosures under Rule 26(a)(3)(A), Benjamin did not disclose his intention to rely on Dueck's deposition testimony until he circulated a draft Pretrial Order on July 15, 2019, thirty days before the start of trial. Prior to the deadline, he disclosed only that he anticipated calling Dueck to testify *at trial*, although Dueck lived in Canada. But, after receiving confirmation on July 12, 2019 that Dueck was not willing to testify at trial, Benjamin sought to introduce her deposition testimony instead. He expressed this intention during a pretrial conference on July 31, 2019. Upon Defendants' objection, the court ordered supplemental briefing and noted that its case management order was "not [an] idle

11

piece[] of paper to be ignored" and that "it's certainly very odd to [the court] that somebody didn't include their deposition designations in their pretrial disclosures." J.A. 6511.

At an August 13, 2019 continuation of the pretrial conference, following the submission of supplemental briefing, Benjamin argued that his disclosure did not violate Rule 26(a). In his view, the rule simply requires the designation of witness testimony a party *expects* to present by deposition—and he had no *expectation* that he would need to present Dueck's testimony by deposition until July 12, 2019 due to miscommunications with Dueck's attorney.

The district court was not persuaded. In support of its decision to exclude the testimony, the court first noted that both parties were required under Rule 26(a)(3)(A)(ii) to designate the witnesses they expected to present by deposition, and that those designations were due by July 1, 2019—the date established in the case management order. The court acknowledged Benjamin's argument that he diligently sought to secure Dueck's live testimony, either in person or via videoconference, but nevertheless found Benjamin's disclosure "untimely under the case management order." J.A. 6633. Finding no support in the case law for Benjamin's subjective-expectation interpretation of Rule 26, and seeing no limiting principle to that interpretation, the court held that Benjamin violated Rule 26(a)(3)(A).

The court then considered whether Benjamin's late designation was substantially justified or harmless. Finding that it was neither, the court stated:

> [H]ere I do think that defendants and the court cannot easily cure the surprise at this late hour. I did read there were lateness designations and then counter-objections. Again, if this had all been done on time, I would have gone

12

through all of this, but I am in the process of working on a lot of different cases, as well as doing the charge in this case, and this is not something that can easily be cured by the court or the defense. Allowing this would disrupt the trial. I would then have to go through all of these objections and rule line by line. And the trial starts tomorrow. This is extremely prejudicial.

J.A. 6635.

On appeal, Benjamin argues that the court abused its discretion by (1) finding that Benjamin violated Federal Rule of Civil Procedure 26(a); and (2) finding that the alleged violation was not substantially justified or harmless. We disagree.

Benjamin argues that "[t]he plain language of [Rule] 26 clearly limits parties' requirement to designate deposition testimony to witnesses who the party *expects* to present by deposition," and that parties must do so at least thirty days before trial. Opening Br. at 42. Accordingly, he argues that he complied with the rule because he did not expect to present Dueck's testimony by deposition until July 12, and because he disclosed his intention to do so on July 15, thirty days before trial began on August 14.

Benjamin cites no support for his claim that Rule 26's designation requirement only applies once a party subjectively forms the expectation to present deposition testimony, and we are aware of none. Indeed, such an interpretation of the Rule would render its deadlines meaningless. But in any event, by the plain language of the Rule, the dictated timelines give way to a district court's order establishing dates for disclosures. *See* Fed. R. Civ. P. 26(a)(3)(B) ("*Unless the court orders otherwise*, these disclosures must be made at least 30 days before trial." (emphasis added)). Here, the district court plainly required the

13

disclosure in question to be made by July 1, 2019. Benjamin failed to abide by that deadline.

Therefore, Benjamin was "not allowed" to use the deposition testimony unless his failure to abide by Rule 26(a) "was substantially justified or . . . harmless." Fed. R. Civ. P. 37(c)(1). This Court addressed what is required to demonstrate substantial justification or harmlessness in *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592 (4th Cir. 2003). We identified five factors that should guide a district court's analysis "in exercising its broad discretion" regarding this question: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* at 597. The first four factors primarily relate to the harmlessness exception, while the fifth factor primarily relates to whether the violation was substantially justified. *Bresler*, 855 F.3d at 190.

Notably, a district court is "not *required* to tick through each of the *Southern States* factors," *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014), and retains "broad discretion in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless," *Bresler*, 855 F.3d at 190 (internal quotation marks omitted). And "[t]he burden of establishing these factors lies with the nondisclosing party." *Wilkins*, 751 F.3d at 222.

Here, the district court properly considered the *Southern States* factors. Regarding harmlessness, the court acknowledged that the late disclosure of deposition designations

14

may be less prejudicial than, for example, a failure to disclose an expert witness, but nevertheless found that there would be prejudice to Defendants if the untimely designation was permitted. The court also factored in its own high volume of cases and the need for parties to abide by case management orders. It went on to find that the surprise of the late disclosure could not be cured, noting the lack of time the court had to consider and respond to Defendants' objections. Further, the court concluded that allowing the late disclosure would disrupt the trial because the court would "have to go through all of these objections and rule line by line," which it found "extremely prejudicial" on the eve of trial. J.A. 6635.

Finally, the court recognized that Dueck's deposition testimony would likely be important evidence supporting Benjamin's theory of the case because she was present at the meeting where Benjamin was allegedly terminated. But the court also viewed the importance of the testimony as weighing against Benjamin. In the court's view, "if you've taken a deposition of somebody and they're outside the subpoena jurisdiction, I just don't see how you don't designate that deposition testimony"—particularly if there is reason to believe that the party will not voluntarily appear before the court. J.A. 6635–36. That analysis aligns with our precedent. We have held that the fourth factor, the importance of the evidence, "must be viewed from the perspective of both parties." *S. States*, 318 F.3d at 598 (internal quotation marks omitted). "To that end, the more important the evidence, the more important it is for the proponent to disclose [the evidence] in a timely manner because

15

it is more likely to prejudice the opposing party." *Bresler*, 855 F.3d at 218 (Wynn, J., concurring in part and dissenting in part) (internal quotation marks omitted).

We conclude that the district court meaningfully engaged with the *Southern States* factors on harmlessness. We find no abuse of discretion in the court's determination that the untimely disclosure was not harmless.

As to whether the late disclosure was substantially justified, the district court found Benjamin's explanation lacking. Benjamin claimed that he did not designate Dueck's deposition testimony because, as of the designation deadline, he still expected her to testify live at trial. But the record reflects that on February 7, 2019—months before the deadline— Dueck's counsel responded to an email from Benjamin's counsel and informed him that Dueck was "generally available" during the trial dates, but that she was "not agreeing to anything at th[at] point" and that they should schedule a telephone call *later that month* to discuss specifics. J.A. 6220. That call was never scheduled.

Nor did Benjamin heed later warnings from Dueck. In a July 2, 2019 email, Dueck's counsel informed Benjamin's counsel that Dueck was "not inclined to participate voluntarily at the trial"—a fact that counsel had "intimated during [a] call" on June 27, 2019, several days before the court-ordered deadline. J.A. 6238. The record thus suggests that Benjamin was, in fact, aware that Dueck did not want to testify at the trial before the designation deadline.

Moreover, while Dueck's counsel did indicate the possibility of Dueck testifying by videoconference, her counsel aptly noted that Benjamin "would need to take the steps necessary to secure an order permitting her testimony by video" pursuant to Rule 43(a).

16

J.A. 6238–39. Responding to Benjamin's belief that Dueck would testify live, the district court stated, "I don't think anyone who looked at Rule 43(a) and researched it could . . . have this notion of, well, I think the judge is probably going to let [Dueck] testify remotely." J.A. 6637.

Indeed, Rule 43(a) requires in-person testimony "unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise." Fed. R. Civ. P. 43(a). Video testimony is only permitted "[f]or good cause in compelling circumstances and with appropriate safeguards"—and then only at the district court's discretion. *Id.* We conclude that the district court did not abuse its discretion when it rejected Benjamin's explanation as insufficient to show substantial justification for his failure to abide by Rule 26(a).

The deadlines set forth in a court's case management order serve an important function in the flow of litigation. *See, e.g.*, *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005) ("A party that fails to provide [Rule 26(a)] disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case."). The district court properly found that Benjamin was aware of the district court's case management order, did not abide by its deadlines, and provided no good reason justifying that failure. Accordingly, we conclude that the district court did not abuse its discretion when it found that Benjamin

17

was in violation of its case management order and Rule 26, and that his violation was neither substantially justified nor harmless.

III.

We next turn to Benjamin's challenge to the imposition of a fourteen-hour time limit for each side's presentation of its case at trial. Before trial, the district court informed both parties of a tentative time limit of fourteen hours for each side and stressed that each party was to be a "steward of [its] own time." J.A. 6517. Neither party objected.

At trial, Benjamin struggled to stay within these limits. In order to comply, he opted not to call one of his witnesses. And as he neared the end of his allotted time, he requested an extra forty-five minutes for his closing, a request the district court denied. Benjamin argues that the district court abused its discretion by setting rigid fourteen-hour time limits and by denying his request for additional time.

"[T]he district court has the authority in a civil case to limit the presentation of evidence by imposing overarching time limits on each party, although . . . district courts should not adopt this practice as a 'matter of course.'" *Raynor v. G4S Secure Sols. (USA), Inc.*, 805 F. App'x 170, 178 (4th Cir. 2020) (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 610 (3d Cir. 1995)). We review the district court's imposition of time limits for abuse of discretion, keeping in mind both the importance of efficiency in the judicial system and the need for "fundamental fairness" at trial. *Id.*

Benjamin was "[a]pprised of [the fourteen-hour time limit] in advance of trial," giving him "notice and adequate time to craft his case." *Id.* at 179. That Benjamin chose not to "craft his case" in such a way that allowed him to remain within the time limits while

18

calling all his witnesses does not demonstrate that the district court abused its discretion. *See id.* at 178 (the fact that the plaintiff was unable to call several witnesses did not demonstrate that the trial court abused its discretion).

Moreover, the district court's denial of Benjamin's request for more time in order to ensure that both parties were bound by the same rules does not constitute an abuse of discretion. And while overarching time limits may not be warranted in every case, "the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008).

It is within the authority of district courts to set time limits in civil cases. Because both parties had adequate notice to be able to craft their cases within the district court's fourteen-hour limit, we conclude that the district court did not abuse its discretion.

IV.

Next, we consider Benjamin's appeal of the district court's decision to admit evidence regarding his past employment.

During discovery, Defendants learned that Benjamin had misrepresented his credentials and employment history to Epiphany School during the recruitment process. Specifically, when describing his prior work experience, Benjamin failed to mention his position as President of Deep Springs College (a position from which he resigned after less

19

than a year); misrepresented the dates associated with another position; and falsely represented that he had a Doctor of Philosophy degree.

At a pretrial conference, Benjamin urged the district court to exclude evidence related to these alleged misrepresentations or, in the alternative, bifurcate the trial. In Benjamin's view, evidence of employment misrepresentations he allegedly made decades ago was not relevant, and to the extent it was, its probative value was heavily outweighed by its prejudicial effect.

The district court allowed the evidence, concluding that it was relevant and that it did not need to be excluded pursuant to Federal Rule of Evidence 403. Further, the court denied Benjamin's request to bifurcate the trial. The court stated, "I don't think bifurcating under Rule [42(b) of the Federal Rules of Civil Procedure] makes sense given that the evidence is relevant. I think the [evidence is relevant to] liability and damages in connection with the contract, obviously, [and] the damages in connection with the [Americans with Disabilities Act] and defamation claim[s]." J.A. 6474.

"We review a trial court's rulings on the admissibility of evidence for abuse of discretion, and we will only overturn an evidentiary ruling that is arbitrary and irrational. To that end, we look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011) (citations and internal quotation marks omitted). Even if the district court errs in admitting evidence, this Court will not reverse if the error was harmless and had no prejudicial affect. *Cisson v. C.R. Bard, Inc.*, 810 F.3d 913, 923 (4th Cir. 2016). "To find [an] alleged error harmless, we need only be able to say with fair assurance, after

20

pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* at 927 (internal quotation marks omitted).

Benjamin argues that the court's decision to admit evidence concerning his prior employment was an abuse of discretion because "(a) [the evidence] was not relevant to the issues at trial, (b) any arguable probative value was substantially outweighed by its unduly prejudicial effect as ancient and largely hearsay evidence of decades-old events and (c) it served as impermissible character evidence transparently intended to make Benjamin seem a liar." Opening Br. at 35. We find no abuse of discretion here.

Maximizing the probative value of the disputed evidence and minimizing its prejudicial effect, as we are required to do on our review, *Cole*, 631 F.3d at 153, the district court's decision to admit the evidence was not unreasonable. At minimum, we agree with the district court that the allegations of employment misrepresentations were relevant to breach-of-contract liability. The evidence provided support for Defendants' claim that they would not have hired Benjamin had they known his complete, accurate employment record and qualifications. Further, while some of the evidence was decades old, not all of it was. The record demonstrates that Benjamin submitted a resume to the recruiting firm—which was then considered by the Epiphany School Board—that incorrectly stated that he had a Doctor of Philosophy degree from Oxford. And, while the evidence had a potential prejudicial effect, the district court minimized the risk of prejudice by communicating limiting instructions to the jury throughout the trial.

21

Accordingly, the district court acted within its discretion when it conducted the required balancing test, refused to bifurcate the trial, and admitted the evidence.

V.

Finally, we consider Benjamin's challenge to the district court's verdict form and jury instructions regarding his breach-of-contract claims against Epiphany School and the Sparks Foundation, as well as his challenge to the verdict form related to his defamation *per se* claim against Sparks.

We employ an abuse-of-discretion standard when reviewing a district court's verdict form and jury instructions, reviewing both holistically. *See Horne v. Owens-Corning Fiberglas Corp.*, 4 F.3d 276, 284 (4th Cir. 1993) (verdict forms); *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (jury instructions). While the structure of the verdict form is left to the discretion of the district court, we must consider whether the form "adequately presented the contested issues to the jury when read as a whole and in conjunction with the general charge, whether submission of the issues to the jury was fair, and whether the ultimate questions of fact were clearly submitted to the jury." *Horne*, 4 F.3d at 284 (quoting *Klein v. Sears Roebuck & Co.*, 773 F.2d 1421, 1427 (4th Cir. 1985)).

And for jury instructions, we "simply determine whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Noel*, 641 F.3d at 586 (internal quotation marks omitted). If a district court declines to give a party's proposed instructions, the court will be reversed only if the requested instructions "'(1) w[ere] correct; (2) w[ere] not substantially covered by the court's charge

to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction[s] seriously impaired' that party's ability to make its case." *Id.* (quoting *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010)). "A set of legally accurate instructions that does not effectively direct a verdict for one side or the other is generally adequate." *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1294 (4th Cir. 1995).

Considering the jury charge as a whole, we conclude that the trial court adequately informed the jury of the relevant issues and legal principles, and that its verdict form and instructions did not prejudice Benjamin.

## A.

Benjamin contends that the district court's decision to draft the verdict form to exclude termination as a potential element of his breach-of contract claim was an abuse of discretion. And as to the jury instructions, he argues that the district court's breach-of-contract instructions were an unsuccessful—and ultimately prejudicial—attempt at following this Court's opinion in *Stone v. University of Maryland Medical System Corp.*, 855 F.2d 167 (4th Cir. 1988). We consider each argument in turn.

## 1.

In his proposed jury instructions, Benjamin suggested that the verdict form ask the jurors to determine whether he was terminated or forced to resign from his positions with Epiphany School and the Sparks Foundation. Instead, the district court instructed the jury that Benjamin had to prove by a preponderance of the evidence that his resignations from

Epiphany School and the Sparks Foundation were involuntary. There was no mention of termination.

The issues were presented to the jurors as follows:

1. Did plaintiff Saul Hillel Benjamin prove by a preponderance of the evidence that his resignation from defendant the Epiphany School of Global Studies was involuntary? . . .

3. Did plaintiff Saul Hillel Benjamin prove by a preponderance of the evidence that his resignation from the Nicholas Sparks Foundation was involuntary?

J.A. 8630–31. If the jurors found that Benjamin's resignation in either case was involuntary, they were instructed also to consider issues 2 and 4—any defenses Epiphany School or the Sparks Foundation may have had.[5] But since the jury answered issues 1 and 3 in the negative, they never reached issues 2 and 4.

---

[5] Issue 2 and Issue 4 of the Verdict Form read:

2. Did defendant the Epiphany School of Global Studies prove by a preponderance of the evidence (1) that it would have terminated plaintiff Saul Hillel Benjamin "for cause" under § 7(b) of the Employment Contract based on information that it possessed in November 2013; or (2) that it would have terminated plaintiff Saul Hillel Benjamin "for cause" under § 7(b) of the Employment Contract based on after-acquired evidence of plaintiff Saul Hillel Benjamin's misconduct; or (3) that it never would have hired plaintiff Saul Hillel Benjamin based on after-acquired evidence of plaintiff Saul Hillel Benjamin's misconduct? . . .

4. Did defendant the Nicholas Sparks Foundation prove by a preponderance of the evidence (1) that it did or would have terminated plaintiff Saul Hillel Benjamin "for cause" under § 6 of the Independent Contractor Agreement based on information that it possessed in November 2013; or (2) that it would have terminated plaintiff Saul Hillel Benjamin "for cause" under § 6 of the Independent Contractor Agreement based on after-acquired evidence of plaintiff Saul Hillel Benjamin's misconduct; or (3) that it never would have

24

Benjamin argues that the district court abused its discretion by "presenting only the question of whether or not [his] resignations from Epiphany [School] and the [Sparks] Foundation were voluntary." Opening Br. at 18. He argues that the formulation used in the verdict form assumes that he resigned and does away with the argument that he was in fact terminated. The facts and record, he argues, provided ample support for a finding that he was involuntarily terminated. In Benjamin's view, omitting the possibility that he was terminated from the verdict form "greatly and inevitably circumscribed the jury's factual analysis, and constitutes an abuse of discretion." *Id.* at 22. We disagree.

Our deferential standard of review of the district court's instructions and presentation of issues to the jury is rooted in an acknowledgment that the district court is better positioned than we are to craft instructions that reflect the evidence produced at trial. *See Nelson v. Green Ford, Inc.*, 788 F.2d 205, 208–09 (4th Cir. 1986). Having heard the evidence and the witnesses, the district court focused the jury on the issue of resignation.

That decision fell within the limits of the district court's discretion. A review of the record reveals that Benjamin signed a handwritten resignation note, subsequently referred to the end of his employment with Epiphany School as a resignation, and informed the Epiphany School Board of his plan to "strictly follow[] the letter and spirit of [their] intended separation agreement." J.A. 8434. Furthermore, the Sparks Foundation ultimately

---

hired plaintiff Saul Hillel Benjamin based on after-acquired evidence of plaintiff Saul Hillel Benjamin's misconduct?

J.A. 8630–31.

25

referred to Benjamin's departure as a resignation after Dueck requested that Benjamin's separation from the Sparks Foundation be deemed a resignation rather than a termination. In light of the record, we cannot say that the district court inadequately presented the issues to the jury or abused its discretion in its verdict form.

Our role is not to ask how we would have drafted the verdict form given the opportunity, but to determine whether the district court abused its discretion when it presented the issues to the jury in the manner that it did. The record reflects evidence supporting the district court's framing of the issue as one of resignation as opposed to termination. Because the district court did not abuse its discretion in drawing up the verdict form, we affirm.

2.

Benjamin also contends that the district court abused its discretion in its jury instructions on his breach-of-contract claim because the district court diverged from this Court's language in *Stone*. In *Stone*, we held that in deciding whether a resignation was voluntary, we must "determine whether the employee was denied the opportunity to make a free choice." *Stone*, 855 F.2d at 174. Four factors guided our inquiry: "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of

26

resignation." *Id.* But we clarified that this is a "totality of [the] circumstances test," meaning that no single factor is dispositive. *Id.*

Moreover, we noted that "the assessment whether real alternatives were offered must be gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation—for example, because of concerns about his reputation—is irrelevant." *Id.* And we explained that "the mere fact that [an employee's] choice is between comparably unpleasant alternatives— e.g., resignation or facing disciplinary charges—does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." *Id.*

The district court recited our language from *Stone* in its jury instructions almost verbatim. Where the question of voluntary resignation was relevant, the court instructed the jury as follows:

> You may find a resignation involuntary if, under the totality of the circumstances, the employer's conduct concerning the resignation deprived the employee of free choice. Factors that you may consider include: (1) whether plaintiff Saul Hillel Benjamin was given some alternative to resignation (including a severance agreement or being terminated for cause); (2) whether plaintiff Saul Hillel Benjamin understood the nature of the choice he was given; (3) whether plaintiff Saul Hillel Benjamin was given a reasonable time in which to choose whether to resign; (4) whether plaintiff Saul Hillel Benjamin was permitted to select the effective date of resignation or other terms of the resignation or severance agreement; and (5) statements or actions by Saul Hillel Benjamin or the Epiphany School of Global Studies during or after the meeting on November 21, 2013, concerning the alleged resignation.

> No one factor is controlling. You must consider the totality of the circumstances in evaluating whether plaintiff Saul Hillel Benjamin proved that his resignation was involuntary. In applying this totality of the circumstances test, the assessment whether alternatives were offered must be gauged by an objective standard rather than by plaintiff Saul Hillel

27

Benjamin's purely subjective evaluation. The fact that plaintiff Saul Hillel Benjamin may have perceived his only option to be resignation—for example, because of concerns about his reputation or being terminated for cause under the contract—is irrelevant. Similarly, the mere fact that the choice is between comparably unpleasant alternatives—such as, resignation or termination for cause under the contract—does not of itself establish that a resignation was involuntary. This principle applies even where the only alternative to resignation for the employee is facing possible termination for cause, unless the employer actually lacked good cause to believe that a basis for termination for cause existed.

J.A. 8592–93, 8601–02, 8610–11.

Benjamin nevertheless contends that these instructions were an abuse of discretion because the district court broke from the language in *Stone* by including factual examples beyond those provided by *Stone*.[6] He argues that these examples both weighed in favor of the Defendants and improperly influenced the jury to consider only the first *Stone* factor

---

[6] The bolded language in the court's jury instructions, copied below, constitutes the factual examples the court included, which Benjamin alleges went beyond the mandate in *Stone*:

> You may find a resignation involuntary if, under the totality of the circumstances, the employer's conduct concerning the resignation deprived the employee of free choice. Factors that you may consider include: (1) whether plaintiff Saul Hillel Benjamin was given some alternative to resignation **(including a severance agreement or being terminated for cause)** . . . . No one factor is controlling. You must consider the totality of the circumstances in evaluating whether plaintiff Saul Hillel Benjamin proved that his resignation was involuntary. … Similarly, the mere fact that the choice is between comparably unpleasant alternatives—such as, resignation **or termination for cause under the contract**—does not of itself establish that a resignation was involuntary. **This principle applies even where the only alternative to resignation for the employee is facing possible termination for cause**, unless the employer actually lacked good cause to believe that a basis for termination for cause existed.

J.A. 8592–93, 8601–02, 8610–11.

28

(whether he was given alternatives). He also contends that the district court's examples were suggestive and misleading.

We find no abuse of discretion in the court's instructions. In ascertaining the voluntariness of a resignation, the crux of the matter is whether the employee was denied the opportunity to make a free choice. *Stone*, 855 F.2d at 174. To assist in that determination, we rely on the four *Stone* factors, mindful that no one factor is determinative. In its instructions, the district court properly homed in on the pertinent legal principle without tilting the scales in favor of one party over the other.[7]

We recognize that district courts are often well-advised not to comment on specific evidence in their jury instructions. *See Hardin*, 50 F.3d at 1294. For "such comments may carry unacceptable risks of removing from the jury its critical task of assigning weight to the evidence presented." *Id.* Nevertheless, the choice to comment on such evidence ultimately belongs to the district court. *Id.* As long as the instructions, on the one hand, "are not merely statements of abstract principles of law with no relation to the facts," and on the other, "do[] not effectively direct a verdict for one side or the other," "the choice of generality versus specificity in the charge is a matter left to the sound discretion of the trial courts." *Id.* at 1294–95.

---

[7] Appellate opinions, like *Stone* "are not jury instructions, nor are they meant to be." *Noel*, 641 F.3d at 588. Our opinion in *Stone* "may guide a district judge's discretion when formulating jury instructions . . . [b]ut [it is] by no means intended to preempt a district judge's discretion to formulate a suitable charge for a specific trial." *Id.*

We further note that Benjamin offered his own jury instructions on breach of contract. Relevant here, those instructions read:

> Under the case law in this Circuit, there are numerous factors that you can consider in evaluating whether an individual was forced to resign due to duress or coercion. For example, factors that may be considered under the totality of all the circumstances include: (1) whether the employee was given some alternative to the ending of the employment relationship; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time within which to choose whether to resign from the employment relationship (for example, whether he was given time to consult with an attorney before making the decision); and/or (4) whether the employee was permitted to select the effective date for termination of the employment relationship.

J.A. 5407. Benjamin's proposal also instructed the jury that it would be asked to determine whether Benjamin proved by a preponderance of the evidence that "the [Sparks] Foundation terminated the Independent Contractor Agreement" and that "Epiphany [School] terminated the Employment Agreement." J.A. 5407–08.

To reverse the district court, we must determine that Benjamin's instructions were correct, were not substantially covered by the district court's given instructions, and "dealt with some point in the trial so important, that failure to give the requested instruction[s] seriously impaired [Benjamin's] ability to make [his] case." *Noel*, 641 F.3d at 586 (internal quotation marks omitted). Even assuming that Benjamin's proposed instructions were correct, we decline to reverse the district court because Benjamin's proposed instructions were substantially covered by the instructions actually given to the jury.

Regarding the instructions' discussion of the *Stone* factors, we note the substantial similarity between Benjamin's proposed instructions and the court's actual instructions. Each factor was addressed and, as noted above, the court's instructions focused the jury on

30

the relevant legal principles. Further, while Benjamin's instructions referred to "termination," a word omitted from the court's actual instructions, we believe that the court's framing of the issue as one of voluntary or involuntary resignation substantially covered Benjamin's requested instructions. We acknowledge the difference between termination and involuntary resignation, but as discussed above, the district court properly focused the jury on the relevant legal issue.

3.

Our determination that the district court did not abuse its discretion in instructing the jury or drafting the verdict form with regard to Benjamin's breach-of-contract claims allows us to quickly dispose of several other issues Benjamin raises on appeal.

First, Benjamin argues that the after-acquired evidence defense should not have been available as a complete defense to breach of contract.[8] But the jury found no breach of contract, so it never reached the issue of related defenses. We need not determine the breadth of a defense that was never considered at trial.

Second, Benjamin also appeals the district court's orders dismissing some claims and parties and granting summary judgment to Defendants on other claims. We apply a de novo standard of review for appeals of both motions to dismiss for failure to state a claim,

---

[8] In its jury instructions, the district court referred to an after-acquired evidence defense as an affirmative defense to breach-of-contract liability, stating that "[a]fter-acquired evidence of an employee's misconduct that would have resulted in termination for cause under a contract (or the employee having never been hired) bars a claim for breach of contract." J.A. 8597.

31

*Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011), and summary-judgment orders, *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 413 (4th Cir. 2015).

Benjamin's appeal of these orders stems from what he alleges to be unlawful discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Under both causes of action, Benjamin must demonstrate some adverse employment action to proceed with his claim. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 566 U.S. 30 (2012) (including "adverse employment action" as an element in a prima facie case of employment discrimination under Title VII); *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 n.8 (4th Cir. 2020) (finding the elements of an employment discrimination claim under Title VII and § 1981 identical). Here, there was no adverse action because the jury determined that Benjamin resigned voluntarily.[9] *Cf. Laird v. Fairfax Cnty.*, 978 F.3d 887, 894 (4th Cir. 2020) (finding no "actionable adverse action" to support an employment-discrimination claim where the employee voluntarily requested a transfer). We therefore affirm the district court's orders disposing of Benjamin's employment-discrimination claims.

---

[9] We recognize that constructive-discharge claims, where an employee feels compelled to resign because of sufficiently intolerable workplace conditions, are actionable under Title VII. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205–06 (4th Cir. 2019). But Benjamin never alleged a *constructive* adverse action, nor does he raise such an argument on appeal. Accordingly, any such argument is waived. *United States v. Bartko*, 728 F.3d 327, 335 (4th Cir. 2013). This means that Benjamin's Title VII claims rise or fall with the existence of a directly (not constructively) adverse action. The jury's conclusion that Benjamin voluntarily resigned resolves that question.

B.

Finally, we consider Benjamin's arguments related to his claim for defamation *per se*. While Benjamin based his defamation *per se* claim on several statements Sparks allegedly made about Benjamin's mental health, only two of those statements were ultimately submitted to the jury: (1) Sparks's statement to the Epiphany School Board that Benjamin "may be suffering from dementia or Alzheimer's or something along those lines" because "he just did not appear rational"; and (2) Sparks's statement to two parents of Epiphany School students that Sparks had to terminate Benjamin because Benjamin "had dementia and bipolar disease" and that "bipolar disease runs in Benjamin's family."[10] J.A. 8633.

The verdict form assumed these two statements were slander *per se* and simply tasked the jury with determining whether Benjamin had proved by a preponderance of the

---

[10] Benjamin also claimed that: (3) Sparks told Dueck in "a series of communications" that Benjamin was "suffering from a mental illness;" and (4) Sparks told the recruiter who recommended Benjamin to Epiphany School that Sparks "thought [Benjamin] was insane . . . [and] that he may have had a stroke or something" and that Benjamin was no longer the man Sparks originally hired. J.A. 4027–28 (second alteration in original). At the summary-judgment stage, the district court held that Sparks's statements to Dueck— Benjamin's wife at the time—"[we]re personal and d[id] not reflect on or relate to Benjamin as a professional," and thus were not defamatory *per se*. J.A. 4032. With that claim gone, only three of the alleged defamatory statements (numbers 1, 2, and 4) were discussed at trial. At the close of Benjamin's evidence, Sparks moved for a directed verdict under Rule 50 of the Federal Rules of Civil Procedure on Benjamin's defamation *per se* claim. Finding that Sparks's comment to the recruiter was a statement of opinion and given the context of the comment and the "reasonable belief of [the] recipient," the district court granted Sparks's Rule 50 motion as to that statement (number 4). J.A. 7610.

33

evidence that Sparks actually made the statements. Specifically, the issues presented in the verdict form were:

> (a) Did the plaintiff, Saul Hillel Benjamin, prove by a preponderance of the evidence that the defendant, Nicholas Sparks, slandered him by saying to the Board of Trustees of the Epiphany School of Global Studies that Saul Hillel Benjamin "may be suffering from dementia or Alzheimer's or something along those lines" because "he just did not appear rational" in his actions in their meeting on November 21, 2013? . . .

> (b) Did the plaintiff, Saul Hillel Benjamin, prove by a preponderance of the evidence that the defendant, Nicholas Sparks, slandered him by saying to [an Epiphany School parent] and her husband that he terminated Saul Hillel Benjamin because Saul Hillel Benjamin "had dementia and bipolar disease" and that "bipolar disease runs in Benjamin's family?"

*Id.* The jury answered both questions in the negative.

Benjamin claims that the district court erred by using quoted language in the verdict form because the "[u]se of quotations without qualifying language . . . incorrectly directed the jury to find whether or not Plaintiff had proven those precise, quoted statements in order to prevail on his defamation claims, rather than similar statements testified to by witnesses that also would be defamatory." Opening Br. at 28.

Again, we review the district court's choices in drafting the verdict form for abuse of discretion. *Horne*, 4 F.3d at 284. In North Carolina, a claim of slander *per se* requires, as relevant here: "(1) [the] defendant spoke base or defamatory words which tended to prejudice [the plaintiff] in his reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule, or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person." *West v. King's Dep't Store, Inc.*, 365 S.E.2d 621, 624 (N.C. 1988). The plaintiff must allege

34

statements "substantially *in haec verba*, or with sufficient particularity" to allow the trial judge to determine as a matter of law that the statements were defamatory. *Andrews v. Elliot*, 426 S.E.2d 430, 432 (N.C. Ct. App. 1993). As the determination that the statements were defamatory is a question of law left to the trial judge, the jury's sole task on the first prong of North Carolina's slander *per se* test is determining whether the defendant in fact made the defamatory statements. *See id.*

Benjamin's assertion that the jury should have been allowed to consider whether he proved statements "similar" to those quoted on the verdict form is incorrect. The trial judge determined, as a matter of law, that the *quoted* statements were defamatory; no such determination was made for "similar" statements. And the court properly limited the jury's inquiry by quoting only those defamatory statements. Without this limitation, even the most diligent and well-intentioned jury could have improperly returned a verdict finding that Sparks had made *some* slanderous statement, without knowing if the district court would have found that statement defamatory as a matter of law.

Furthermore, the use of pattern instructions is the preferred method of jury instruction in North Carolina—and North Carolina's pattern jury instructions recommend quoting the allegedly defamatory claims to the jury. N.C.P.I.–Civil, 806.65 (2012); *see In re Will of Leonard*, 323 S.E.2d 377, 379 (N.C. Ct. App. 1984). The district court's language aligned with the pattern instructions.[11]

---

[11] Benjamin points out that the pattern instructions "state the issue for the jury simply as: 'Did the defendant slander the plaintiff?'" Reply Br. at 13 (quoting N.C.P.I.–Civil, 806.65 (2012)). He argues that, although the pattern instructions allow the trial court to quote the

The formulation of the language on a verdict form falls within the discretion of the district court. Here, the district court did not abuse its discretion when it drafted the form, in reliance on North Carolina's pattern jury instructions, in such a manner that properly limited the jury's consideration to the narrow question before it.

## VI.

For the reasons given above, the judgment of the district court is affirmed.

*AFFIRMED*

defamatory language in its *instructions*, they do not permit the court to include the language in the *verdict form*. He claims this distinction is "for good reason," but he provides none. *Id.* We do not read the pattern instructions as limiting trial courts to only those six words in drafting their verdict forms.

36